**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **MATCH GROUP, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | **Civil Action No.** 6:21-cv-147 |
| | § | |
| **MUZMATCH LIMITED** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendant.** | § | |
| | § | |
| | § | |

## <u>PLAINTIFF MATCH GROUP, LLC'S COMPLAINT</u>

### I.      INTRODUCTION

Match Group, Inc. is the worldwide leader in online dating with multiple popular brands of matchmaking services offered by subsidiaries, including Tinder®, Match®, PlentyofFish®, OkCupid®, and more.  Plaintiff Match Group, LLC ("Match"), a wholly-owned subsidiary of Match Group, Inc., owns the Match® and Tinder® services and their related intellectual property. When the Match service launched as Match.com in 1995, it pioneered the online-dating market. Today, Tinder is one of Match's flagship brands.  When the Tinder app was released, it launched a cultural revolution in social networking and online dating.  The Tinder app is famously characterized by a stack of cards containing photographs of potential connections nearby.  If a user is interested in the person shown, the user drags a card to the right.  If not, the user drags the card to the left.  If two users are interested in each other, a connection has been made, and the users are permitted to communicate with one another through the app.  The app has become so well-known that an entire generation is often described as the "Tinder generation."

Match and its predecessors spent significant time and effort developing and implementing the inventions embodied in versions of the Tinder app and claimed in the utility patents at issue here.  Match and predecessors have spent significant time and money advertising the Tinder brand, including the unique draggable-card-based design.  As a result of all of these efforts, Match has significant intellectual-property rights related to the Tinder app and the Tinder brand.  This is a case about infringement of that intellectual property.

Muzmatch Limited ("Muzmatch"), incorporated in January 2015, originally launched as a web-based dating service in 2011, but later copied the Tinder app's world changing, draggable-card-based, mutual opt-in app interface.  As acknowledged by third-party publications upon its release, Muzmatch's mobile dating app is considered "the Tinder-like app for Muslims," being that it is virtually identical to Tinder in its functionality and general look and feel.  The competitive reason is obvious.  Muzmatch sought to mimic the Tinder app's functionality, trade off of Match's name, brand, and general look and feel, meet user expectations that Match created, and build a business entirely on a Tinder-clone, distinguished only by Muzmatch's Muslim-cultural-specific marketing strategy.  All of these actions infringe upon Match's valid and enforceable intellectual property rights.  Match thus brings this Complaint to stop Muzmatch's unlawful use of this intellectual property.

## II.       THE PARTIES

1.       Match is a Delaware Corporation with a principal place of business in Dallas, Texas at 8750 N. Central Expressway, Suite 1400.

2.       Muzmatch is a company existing under the laws of the United Kingdom with a principal place of business in Ilford, United Kingdom.

### III.       JURISDICTION AND VENUE

3.       This Court has personal jurisdiction over Muzmatch consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute.  Muzmatch conducts business, and has committed acts of patent infringement and/or has induced and/or has contributed to acts of patent infringement by others in the Western District of Texas, and elsewhere in the United States.  This Court has original subject matter jurisdiction over Match's claims for patent infringement pursuant to the Federal Patent Act, 35 U.S.C. § 101 *et seq.* and 28 U.S.C. §§ 1331 and 1338(a).  This Court has original subject matter jurisdiction over Match's claims for trademark infringement pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a) and (b) because it involves an action for violation of the Lanham Act, 15 U.S.C. §§ 1051 *et. seq.*  This Court also has original subject matter jurisdiction over Match's state law claim of unfair competition pursuant to 28 U.S.C. § 1338(b), as this claim is joined with Match's substantial and related claim brought under the Federal Patent Act, 35 U.S.C. § 1010 *et seq.*  In addition, the Court has supplemental jurisdiction over Match's state law claims pursuant to 28 U.S.C. § 1367.

4.       Venue is proper in this District for Muzmatch because it is a foreign corporation that is not subject to the patent venue statute in 35 U.S.C. § 1400(b), and thus "may be sued in any judicial district."  28 U.S.C. § 1391(c)(3); *see also In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018).

### IV.       FACTUAL ALLEGATIONS

#### A.   The Creation of the Tinder app

5.       The Tinder application ("Tinder app") was first conceived at and created by "Hatch Labs," a technology incubator then owned by Match's then ultimate parent company, IAC/InterActive Corp.

6.     First officially released in September 2012 for iPhone devices, the Tinder app revolutionized online dating services.  From its earliest days, the premise of the Tinder app has been fundamentally the same.  Users are shown other users ("potential match(es)") based on certain parameters, including age range and geographic location.  These potential matches are shown on a virtual card with a photo of the nearby potential match.  The user is then given a choice to indicate interest (or lack thereof) in the potential match merely by dragging the photo off the screen to the right (if interested) or left (if not).  Although the earliest iteration of the Tinder app did not include the ability to gesture left or right, once implemented, the Tinder Swipe® feature became a cultural sensation uniquely associated with the app.

7.     Tinder is now one of the most popular apps in the world.

**B.     Match's Tinder-Related Intellectual Property**

8.     Match has been awarded a utility patent, U.S. Patent No. 9,733,811 (the "'811 Patent"), entitled "Matching Process System and Method," in connection with the functional innovations embodied in versions of the Tinder app.  The '811 Patent is attached as **Exhibit A**.

9.     Match has been awarded another utility patent, U.S. Patent No. 9,959,023 (the "'023 Patent"), entitled "Matching Process System and Method," in connection with other innovations embodied in the Tinder app.  The '023 Patent is attached as **Exhibit B.**

10.     Match has been awarded another utility patent, U.S. Patent No. 10,203,854 (the "'854 Patent"), entitled "Matching Process System and Method," in connection with other innovations embodied in the Tinder app.  The '854 Patent is attached as **Exhibit C**.

11.     Match has federal trademark registrations, Reg. Nos. 4,666,847 and 4,805,047, for the mark MATCH and Design in connection with computer application software for use with mobile devices, namely, software for the purpose of accessing online dating services; dating services; internet based social networking, introduction, and dating services.  The applications

were filed on January 6, 2015, and May 20, 2014, respectively, and the marks were first used in commerce on April 23, 2014, and March 17, 2015, respectively.   Match has used the mark continuously in commerce since these dates.   Copies of these registration certificates are attached as **Exhibit D**.   The MATCH and Design mark is shown below:



12.     In addition to Match's registered rights in the MATCH and Design mark, Match has acquired valuable common-law rights in the MATCH and Design mark through its continued use of the mark in commerce across the United States.   Consumers widely recognize the MATCH and Design mark as indicative of Match's online dating services.

13.     In addition to registered rights in the stylized MATCH and design, Match has acquired extensive rights in the famous trademark MATCH throughout the United States.   Since at least as early as 1995, Match has used the MATCH mark extensively to refer to its online-dating services and apps, and consumers understand MATCH to signify the same.[1]   (see screenshot of the App Store attached as **Exhibit E**).[2]

---

[1] *See, e.g.*,   https://www.ft.com/content/9121cf64-fee8-48ce-8860-7d88f6444e3a   ("Shares in parent company Match, whose subsidiaries also include Hinge and OkCupid, traded at a record high in mid-December as it joined the Nasdaq 100.").

[2] *See also, e.g.*, Leah Stodart, Match is a user-friendly dating site that's serious, but not too serious, Mashable, (March 21, 2020) https://mashable.com/review/match-review-online-dating/; Elaine Moore, How Tinder became the app that defines online dating, Financial Times (Jan. 7, 2021), https://www.ft.com/content/9121cf64-fee8-48ce-8860-7d88f6444e3a; Dave Carlin, Love In The Time Of COVID: Dating Apps Flourishing As Lonely Singles Scramble In Advance Of Valentine's Day, CBS New York (January 3, 2021, 9:53 PM), https://newyork.cbslocal.com/2021/01/03/dating-sunday-dating-apps-match-okcupid-tinder-bumble/ ("The dating site Match predicted Dating Sunday will be the busiest single day in the app's history.").

14.     The MATCH mark is famous under Lanham Act § 43(c) because it is widely recognized by the general consuming public of the United States as a designation of source for Match's goods and services.

15.     Match also has federal trademark registrations, Reg. Nos. 2,088,545 and 4,582,447, for the mark MATCH.COM in connection with computer services, namely, providing information regarding, and in the nature of, on-line dating and introduction services; dating services; internet based social networking, introduction, and dating services.  The mark has been in use in commerce for these services continuously since at least as early as March 10, 1995.  Copies of the registration certificates are attached hereto as **Exhibit F**.

16.     In addition to its incontestable registered rights in the MATCH.COM mark, Match has accrued extensive common-law rights by its continued use of the mark in commerce for over 25 years nationally.  The mark is a household name among consumers and readily identifies Match's services.

17.     The MATCH.COM mark is famous under Lanham Act § 43(c) because it is it is widely recognized by the general consuming public of the United States as a designation of source for Match's goods and services.

18.     Match also has a federally registered trademark, Reg. No. 4,465,926, for SWIPE in connection with computer application software for mobile devices, namely, software for social introduction and dating services.  Match's predecessor first used this mark in commerce on or around March 28, 2013.  A copy of the registration certificate for Match'S SWIPE mark is attached as **Exhibit G**.

19.     Pursuant to the Lanham Act, Match's several registrations constitute prima facie evidence of: (a) the validity of the respective marks and of the registration of those marks; (b)

Match's ownership of the marks; and (c) Match's exclusive right to use the marks on or in connection with the products and services stated in the registrations, including the exclusive right to license the marks on or in connection with the products and services stated in the registrations. 15 U.S.C. §§ 1057(b) and 1115(a).  In addition, Match's registrations constitute constructive notice of Match's claim of ownership of the marks.  *See* 15 U.S.C. § 1072.

20.    Match is also currently seeking federal registrations for SWIPE LEFT and SWIPE RIGHT in connection with mobile applications for social introduction and dating services.

21.    Match also has common-law trademark rights in these terms.  For example, Match, through the Tinder app and other apps using the Swipe® feature, has used the marks SWIPE LEFT and SWIPE RIGHT in connection with mobile applications for social introduction and dating services nationwide.  It first used these marks in commerce on or around March 28, 2013.  Match's SWIPE-family of marks includes numerous other marks containing the SWIPE formative element, including SWIPE SESSIONS; SWIPE NIGHT; SINGLE, SWIPE, REPEAT; SWIPE LIFE; and SWIPE CITY.  Match uses these marks and the SWIPE-family of marks on ancillary goods and services, including clothing, cosmetics, blogs, podcasts, concerts, and entertainment programs.

22.    SWIPE, SWIPE LEFT, and SWIPE RIGHT have become synonymous with the Tinder app.

23.    For example, the Telegraph listed "swipe" as a 2015 "word of the year," writing that its choice "reflect[ed] the popularity of the dating app Tinder, in which users can swipe their finger across the screen to approve or dismiss would-be dates."[3]

---

[3] *See* 'Binge-watch', 'clean eating' and 'manspreading' Among 2015 Words of the Year, available at: https://www.telegraph.co.uk/news/newstopics/howaboutthat/11975734/Binge-watch-clean-eating-and-manspreading-among-2015-Words-of-the-Year.html.

24.     The Oxford English Dictionary also specifically defines the terms "swipe right" and "swipe left" in connection with the Tinder app:





25.     Similarly, a recent episode of the game show "Jeopardy" indicated that SWIPE LEFT and SWIPE RIGHT were trademarks of the Tinder app.

26.     Indeed, Match's wordmarks have been famous since before the Muzmatch App even existed.  For example, in a February 2014 article in TIME Magazine, TIME described the Tinder app's "swipe" as "iconic."[6]  Similarly, in February 2015, a CIO.com article described SWIPE RIGHT as a "trademark" of Tinder.[7]  In fact, the Atlanta Hawks, in partnership with Match,

---

[4] *See* Definition of "Swipe Right", available at: https://www.lexico.com/definition/swipe_right.

[5] *See* Definition of "Swipe Left", available at: https://www.lexico.com/definition/swipe_left.

[6] *See* Inside Tinder: Meet the Guys Who Turned Dating Into an Addiction, available at: https://time.com/4837/tinder-meet-the-guys-who-turned-dating-into-an-addiction/.

[7] *See* Is Tinder the Next Big Social Network for Marketers?, available at: https://www.cio.com/article/2878969/is-tinder-the-next-big-social-network-for-marketers.html.

hosted a highly publicized "Swipe Right Night" at an Atlanta Hawks game in January 2015, reflecting the then-existing fame of the mark.[8]

27.     Match also has legally protectable trade dress in the Tinder app.  For example, the Tinder app's card-stack appearance is a non-functional design element with source-identifying significance, either because it is inherently distinctive or has acquired secondary meaning.

28.     Third-party Internet publications have recognized that this design is synonymous with the Tinder app, describing the "Tinder swipable cards interface" as "famous" and as taking "the app store by storm."[9]

29.     This card-stack interface has also been described as "iconic."[10]

30.     Indeed, this card-stack interface is so well-known and iconic that, when other businesses use similar interfaces in connection with non-social network, non-dating apps, third-party publications describe such uses as making the app look like the Tinder app.

31.     Similarly, Match has protectable trade dress in its "It's a Match!" screen, shown below:

---

[8] *See* The Atlanta Hawks Had A Tinder-Themed Night, and This Is What Happened, available at: https://ftw.usatoday.com/2015/01/the-atlanta-hawks-had-a-tinder-themed-night-and-this-is-what-happened

[9] *See, e.g.*, Tinder-style Cards with NativeScript - Love At First Swipe, available at: https://nativescript.org/blog/tinder-style-cards-with-nativescript---love-at-first-swipe/.

[10] *See* Inside Tinder: Meet the Guys Who Turned Dating Into an Addiction, available at: https://time.com/4837/tinder-meet-the-guys-who-turned-dating-into-an-addiction/.



32.    As with the card-stack interface, this screen has distinctive trade-dress source-identifying significance.

33.    Match also regularly used this screen until on or around May 29, 2019, as a source-identifier in various advertising materials, including in the Apple App Store, the Google Play Store, and on YouTube.

34.    Match owns all rights to the intellectual property identified above.

**C.    Muzmatch Created and Marketed as a Tinder Copycat**

35.    Muzmatch was incorporated on or about January 7, 2015, and developed an online Muslim dating application (the "Muzmatch App") for iOS and Android users where single Muslims can search for a partner.

36.    Like the Tinder app, the Muzmatch App is a dating app that relies on a card-stack interface and a mutual opt-in premise before users communicate.

37.     Muzmatch's creator, Shahzad Younas, has even been quoted admitting that, in creating Muzmatch, "[he] took what was good from Tinder, which is kind of the swipe aspect, then added a lot more features to make it more conducive to the Muslim market."[11]

38.     In the words of an article by Space-O Technologies, Muzmatch is "the Tinder-like app for Muslims."[12]

39.     An article by TechCrunch recognized that "Muzmatch's feature-set has some basic mechanisms that would be familiar to any Tinder user, like the ability to 'like' or 'pass' on a possible match, and the ability to chat in-app with mutual matches[.]"[13]

40.     In an interview with Muzmatch founder, Shahzad Younas, BBC Asian Network described Muzmatch as "the world's first Tinder-styled app [that] is now available for Muslims."[14]

41.     Like users of the Tinder app, users of the Muzmatch app interact with "cards" containing photos of other users as shown below:

---

[11] *See* Tinder For Muslims Lets Users Hide Their Photos, Appoint Guardian, available at: https://www.vice.com/en/article/4x353b/tinder-for-muslims-lets-users-hide-their-photos-appoint-a-guardian.

[12] *See* 3 Lessons of Muzmatch 'Muslim Tinder' That Raise $7M to Become the Next Big Tinder Alternative for Muslim Majority, available at: https://www.spaceotechnologies.com/tinder-alternative-muzmatch-lessons-startups/.

[13] *See* YC-Backed Muzmatch Definitely Doesn't Want To Be Tinder for Muslims, available at: https://techcrunch.com/2017/08/03/yc-backed-muzmatch-definitely-doesnt-want-to-be-tinder-for-muslims/

[14] *See* BBC Asian Network Interview, available at: https://www.youtube.com/watch?v=072Ct_upiDY.



42.     Like Tinder app users, Muzmatch users gesture left and right on cards containing

user photos to indicate whether or not the user is interested in the person shown.



43.     As on the Tinder app, on Muzmatch, gesturing left indicates a user is not interested

in the person shown, while gesturing right indicates that the user is interested in the person.

44.     Like on the Tinder app, two users cannot communicate over Muzmatch until they

both indicate interest in one another.

45.     Like on the Tinder app, if two users on Muzmatch both indicate interest, a screen is shown indicating a connection.

46.     Muzmatch's original "match" screen is nearly identical to the "It's a Match!" screen that was in use by Match prior to May 29, 2019, and that users associate with Match.  At the top of the screen is a large exclamatory phrase set off in the same cursive font.  Below that, identical text indicating that the users have expressed a mutual interest is displayed in the app's default font along with two circles, enclosed in white borders, that display the photographs of the matched users.  Below that, both apps include similarly sized and shaped buttons presenting the option to send a message.  Both "match screens" are placed against a dark background.  These similarities are shown in the pictures below:

 

47.     The conclusion that Muzmatch copied this screen from the Tinder app is inescapable.

48.     More recently, Muzmatch has updated the screen displayed when users connect:



49.     While this screen has the circular photographs touching each other, and the background is no longer gray, it retains all salient elements of Match's trade dress, including identical text in the same font.  Moreover, this screen now uses an orange/pink fade background, which is strongly associated with the Tinder app, and protected by Match Group's federal trademark registration no. 5,915,359 for the Tinder flame logo and colors:



50.     Muzmatch's replacing the solid-colored dark background with the color scheme taken from the Tinder logo was not coincidental.

51.     Compounding the confusion from the copycat looks of the Muzmatch App, Muzmatch also makes extensive use of Match's registered SWIPE mark as well as its SWIPE LEFT and SWIPE RIGHT word marks.

52.     For example, on its website, Muzmatch notes that "[i]t is always free to swipe, match, chat and marry on muzmatch."[15]

53.     Match used the tagline "Swipe. Match. Chat." from 2017 until at least 2019.

54.     One recent blog post on Muzmatch's website about a couple who found love on the Muzmatch App is entitled "Swipe Right! #muzmatchsuccess."[16]

55.     Moreover, Muzmatch includes a "Help" (or Frequently Asked Questions) section with inquiries such as: (1) "[w]hy does a timer come up when I try to swipe someone";[17] (2) "[w]hat is reset swipes (likes and passes)";[18] and "[h]ow do I see who liked me in Explore" and describing that Explore is split into "NEW and PREVIOUSLY SWIPED."[19]

56.     Moreover, as mentioned above, Muzmatch's creator, Shahzad Younas, has even been quoted stating that, in creating Muzmatch, "[he] took what was good from Tinder, which is kind of the swipe aspect, then added a lot more features to make it more conducive to the Muslim market."[20]

---

[15] *See* Muzmatch website, available at: https://muzmatch.com/en-US/.

[16] *See* Muzmatch Success Stories Blog, available at: https://muzmatch.com/en-GB/blog/success-stories/swipe-right.

[17] *See* Muzmatch Help Section, available at: https://muzmatch.com/en-GB/help/why-does-a-timer-come-up-when-i-try-and-swipe-someone.

[18] *See* Muzmatch Help Section, available at: https://muzmatch.com/en-GB/help/what-is-reset-swipes-(likes-and-passes).

[19] *See* Muzmatch Help Section, available at: https://muzmatch.com/en-GB/help/how-do-i-see-who-liked-me-in-explore.

[20] *See* Tinder For Muslims Lets Users Hide Their Photos, Appoint Guardian, available at: https://www.vice.com/en/article/4x353b/tinder-for-muslims-lets-users-hide-their-photos-appoint-a-guardian.

57.     In addition to copying the overall look and feel and protectable trade dress of Match's Tinder app, its patented functionality, and Match's trademarks, Muzmatch copied Match's very name and its famous house mark, MATCH and MATCH.COM.  The MUZMATCH trademark and Muzmatch's domain name, MUZMATCH.COM incorporate Match's trademarks in their entirety.  The only addition is the abbreviated "Muz," short for "Muslim," which is descriptive of the target consumer and thus wholly insufficient to diminish the likelihood of consumer confusion by its use of Match's famous marks.

58.     Muzmatch adopted the MUZMATCH name and trademark, and the MUZMATCH.COM domain name long after Match began using its MATCH and MATCH.COM marks.

59.     Muzmatch obtained a trademark registration for the infringing MUZMATCH mark, Reg. No. 5,002,324, in connection with downloadable mobile applications for dating; chat room services for social networking; and internet-based dating, social introduction and social networking services on July 19, 2016.

## V.     CAUSES OF ACTION

### A.    COUNT ONE:  INFRINGEMENT OF THE '811 PATENT BY MUZMATCH

60.     Match incorporates by reference the preceding paragraphs as if fully set forth herein.

61.     Muzmatch directly infringes the '811 Patent by making and using a system that practices one or more claim of the '811 Patent.

62.     For example, independent claim 1 of the '811 Patent recites:

A computer implemented method of profile matching, comprising:

> electronically receiving a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform;

electronically receiving a first request for matching, the first request electronically submitted by a first user using a first electronic device;

determining a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request;

causing the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user;

determining that the first user expressed a positive preference indication regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphical user interface;

in response to determining that the first user expressed the positive preference indication regarding the first potential match, automatically causing the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match;

determining that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match;

determining to enable initial communication between the first user and the second user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user;

in response to determining to enable initial communication between the first user and the second user, causing the graphical user interface to display to the first user the graphical representation of the first potential match;

determining that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding to a third user;

preventing communication between the first user and the third user after determining that the first user has expressed the negative preference indication regarding the third user;

determining that the first user expressed a positive preference indication regarding a fourth potential match of the set of potential matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user; and

preventing communication between the first user and the fourth user after determining that the fourth user has expressed a negative preference indication regarding the first user.

63.     Claim 2 of the '811 Patent recites:

The method of claim 1, further comprising:

in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user, causing the display of a graphical notification, on the graphical user interface of the first electronic device, that a match exists between the first user and the second user, the graphical notification comprising a user interface control enabling the text area to be presented to the first user.

64.     Claim 3 of the '811 Patent recites:

The method of claim 1, wherein the set of potential matches for the first user comprises one or more potential matches that are each associated with a geographic location within a threshold distance of a geographic location associated with the first user, the threshold distance being a stored value.

65.     Muzmatch is the listed distributing company for the Muzmatch App on the Apple App Store and the Google Play Store.  Thus, Muzmatch directly infringes at least claims 1, 4, and 7 of the '811 Patent by making and/or using the Muzmatch system.

66.     Muzmatch's servers practice all of the limitations of claim 1, which is representative of claims 4 and 7.  For example, Muzmatch's servers electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform.  When a Muzmatch App user downloads and initially accesses the application, the user can sign up using Email, Google, or Facebook.

67.    Through the account setup process, Muzmatch receives from each user an online profile comprising traits of respective users, as described below in Muzmatch's "Help" section.



68.    Muzmatch's servers also perform the step of electronically receiving a first request for matching, the first request electronically submitted by a first user using a first electronic device. For example, after authorizing his or her account, the Muzmatch user can go to the Finder where he or she can indicate positive and negative preferences for various potential matches.  At a point before those potential matches are shown, Muzmatch has received a request for matching.



69.     One way that the Muzmatch App meets this limitation is when Muzmatch's servers electronically receive a first request for matching, the first request electronically submitted by a first user using a first electronic device, as shown above.  Muzmatch's servers receive the request from a Muzmatch user's device operating the Muzmatch App.

70.     Another way that the Muzmatch App meets this limitation is when the Muzmatch App electronically receives a first request for matching, the first request electronically submitted by a first user using a first electronic device, as shown above.  The Muzmatch App receives the request from a user.

71.     Muzmatch's servers also perform the step of determining a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request.  In response to receiving the parameters set forth in the request for matching contained in the Muzmatch App user request, Muzmatch determines a set of potential matches for the requesting user based on parameters such as location, age, and gender:



**How do I filter the profiles you show me?**

To filter the profiles you see, ensure your muzmatch app has Location permissions - go to Menu → Filters - and grant Location Permissions.

Once done go to DISCOVER and view new profiles - your location should now update using your GPS and use any filters set.

Note: Users shown in Explore's Likes You and Visited You are only filtered by your Age and Location Filters.

The more you filter the less profiles you will see.

Close

72.     The Muzmatch App meets this limitation when Muzmatch's servers determine a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request, as shown above.  Another way that the Muzmatch App meets this limitation is when the Muzmatch App determines a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request, as shown above.  The Muzmatch App makes the determination by querying or polling the Muzmatch servers for and receiving a set of potential matches.

73.     Muzmatch's servers also perform the step of causing the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user.  Muzmatch causes the display of potential matches of other Muzmatch App users to appear on the first Muzmatch App user's graphical user interface.  The potential matches shown correspond with the determination of potential matches described in ¶ 72 above:



74.     Muzmatch's servers also perform the step of determining that the first user expressed a positive preference indication regarding the first potential match at least by determining that the first user performed a first gesture associated with the graphical representation of the first potential match on the graphical user interface.  A Muzmatch user may affirmatively select (or reject) another Muzmatch user by using gestures (i.e., drag the potential match's card left or right).  Muzmatch makes a determination based on this user indication:



75.     Muzmatch's servers also perform the step of, in response to determining that the first user expressed the positive preference indication regarding the first potential match, automatically causes the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match.   After determining that the first Muzmatch App user has expressed a positive preference via  a gesture, Muzmatch automatically presents a second potential match:



76.     Muzmatch's servers also perform the step of determining that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match.   Muzmatch compares the selected preference of each potential match (i.e., of a first Muzmatch App user and a second Muzmatch App user), including making a determination whether the first Muzmatch App user and the second Muzmatch App user each expressed a positive preference for each other.



77.    Muzmatch's servers also perform the step of determining to enable initial communication between the first user and the second user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user.





78.     Muzmatch's servers also perform the step of, in response to determining to enable initial communication between the first user and the second user, causes the graphical user interface to display to the first user the graphical representation of the first potential match.



79.     Muzmatch's servers also perform the step of determining that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated

with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding to a third user.  Muzmatch determines whether the first Muzmatch user expressed a negative preference for a third Muzmatch user by determining whether the first Muzmatch user gestured left:



80.    Muzmatch's servers also perform the step of preventing communication between the first user and the third user after determining that the first user has expressed the negative preference indication regarding the third user.  If the first Muzmatch user expressed a negative preference for a third Muzmatch user, the Muzmatch App will not allow the first and third users to communicate through the Muzmatch App.  By default, the Muzmatch App only allows users to message other users who they have matched with.



81.   Muzmatch's servers also perform the step of determining that the first user expressed a positive preference indication regarding a fourth potential match of the set of potential matches at least by determining that the first user performed the first gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user.  A Muzmatch user may affirmatively select (or reject) another Muzmatch user by gestures.  Muzmatch makes a determination based on this Muzmatch user indication.  Muzmatch determines whether a first Muzmatch user has made a positive preference indication in the form of a first gesture.



82.    Finally, Muzmatch's servers perform the step of preventing communication between the first user and the fourth user after determining that the fourth user has expressed a negative preference indication regarding the first user because by default, the Muzmatch App only allows communication between users who have matched.



83.    Muzmatch's servers practice all of the limitations of claim 2.   For example, in response to determining that both the first user has expressed the positive preference indication

regarding the second user and the second user has expressed the positive preference indication regarding the first user, Muzmatch's servers cause the display of a graphical notification, on the graphical user interface of the first electronic device, that a match exists between the first user and the second user, the graphical notification comprising a user interface control enabling the text area to be presented to the first user:



84.     Muzmatch's servers practice all of the limitations of claim 3.   For example, Muzmatch's servers perform the method of claim 1, wherein the set of potential matches for the first user comprises one or more potential matches that are each associated with a geographic location within a threshold distance of a geographic location associated with the first user, the threshold distance being a stored value that is set by the user preferences:



85.     On information and belief, at least some of Muzmatch's servers perform this method in the United States.[21]

86.     Muzmatch also indirectly infringes the '811 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging and instructing end-user customers to install and use the Muzmatch App in the United States.

87.     Muzmatch took the above actions intending to cause infringing acts by others.

88.     Muzmatch was aware of the '811 Patent.

89.     For example, on a February 7, 2018 earnings call, Match Group, Inc.'s CEO, Mandy Ginsberg, discussed the '811 Patent.  Additionally, it was well-publicized that Match was seeking a patent related to its Swipe feature.  For example, a June 22, 2015 article in Adweek indicated that Tinder was prosecuting a patent related to "swipe" functionality.

---

[21] *See, e.g.*, https://muzmatch.com/en-US/privacy ("When you provide personal information through our Service, the information may be sent to servers located in the United States . . . ," "While our primary data centres are in the United States, we may transfer personal information or other information to our offices outside of the United States.")

90.     Also in 2018, Match filed a lawsuit against Bumble, for infringement of the '811 Patent.  That lawsuit was widely publicized, including in a full-page ad response by Bumble in the New York Times, which itself received substantial publicity.

91.     Because the Muzmatch app behaves substantially the same as both the Tinder app and the Bumble app, Muzmatch must have known that its app also infringes the '811 Patent.

92.     If Muzmatch did not know that the actions it encouraged constituted infringement of the '811 Patent, Muzmatch nevertheless subjectively believed there was a high probability that others would infringe the '811 Patent but took deliberate steps to avoid confirming that it was actively inducing infringement by others.

93.     Muzmatch also indirectly infringes the '811 Patent by contributing to infringement by others, such as end-users, by providing within the United States software components for operating the Muzmatch App and interacting with the servers associated with the Muzmatch App. These software components are, for example, the Muzmatch App, and the download package that contains the Muzmatch App for interacting with Muzmatch's servers.  Muzmatch's end-users directly infringed the '811 Patent by, for example, installing and using the Muzmatch App in the United States to use the Muzmatch system in the United States and Muzmatch servers in the United States.  These software components are known by Muzmatch to be especially made or adapted for use in Muzmatch's infringing system.

94.     Muzmatch has known these components to be especially made or especially adapted for use in infringement of the '811 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Alternatively, Muzmatch subjectively believed there was a high probability that these components were especially made or especially adapted for use in an infringement of the '811 Patent and that these components are not

a staple article or commodity of commerce suitable for substantial non-infringing use but took deliberate steps to avoid confirming the same.

95.     Muzmatch's infringement of the '811 Patent is and has been willful.  Muzmatch at a minimum knew or had reason to know of certain facts which would lead a reasonable person to realize their actions were unreasonably risky with respect to infringement of the '811 Patent.  For example, as discussed above, Muzmatch is and has been aware of the '811 Patent.  To Match's knowledge, Muzmatch has not attempted to avoid infringement of the patent or to design around it.  Muzmatch designed the Muzmatch App to mirror the Tinder app and its functionality specifically to compete with the Tinder app and avoid a barrier to entry in the market by mimicking the Tinder app's functionality in connection with an online matchmaking app.

96.     The inventions claimed in the '811 Patent are not directed to an abstract idea.  Instead, the claims are directed to an improvement in computer and user interface functionality as well as in online social networking.  *See* Order Denying Defendant Bumble Trading Inc.'s Motion to Dismiss Match Group, LLC's First Amended Complaint ("Bumble Order") at 10–11, *Match Group, LLC v. Bumble Trading Inc.*, No. 6:18-cv-00080-ADA (Dec. 18, 2018) (Albright, J.) (holding that the '811 Patent "recites non-abstract subject matter" and "describes narrower functionality and more specifics about the flow of the improved interface and system").

97.     Specifically, the inventors of the continuation-in-part aspect of the '811 Patent set out to improve the user interface functionality in dating and other matchmaking apps.  Gesturing on a graphical representation of a user to denote positive, and a different gesture to denote negative, in connection with a mutual opt-in matchmaking app, was a non-conventional, concrete improvement in how touchscreen user interfaces interact with users sifting through and making binary choices, such as indicating positive or negative preferences related to potential matches.

Although the general dragging gesture may have been known in the prior art, the specific application to a graphical representation of a user in the specific matchmaking context claimed, in order to make binary choices expressing a preference or lack thereof regarding potential matches, was unknown and unconventional.

98.     This interface improvement allows users to sift through more information, more quickly than previous interfaces addressing similar binary choice user decisions.     These efficiencies to user interaction revolutionized the world of online dating.

99.     That the inventions are directed toward new computer-specific user interface technology is confirmed by the surrounding limitations.  The inventions claim a specific computer method, system, and computer-readable medium of matchmaking where parties are not permitted to communicate unless and until a match is made, user profiles are specifically "online-dating profiles" and those profiles must be "associated with a social networking platform," a type of platform that is itself computer specific.  The claims further describe various actions of a graphical user interface that provide certain information at certain times in response to certain types of inputs. This is not conventional post-solution activity in order to monopolize an abstract idea of matchmaking or even mutual opt-in matchmaking.  Instead, these limitations recite a particularly advantageous computer embodiment of a matchmaking process that also solves computer-specific problems related to the ease of creating fake accounts and profiles, the inconvenience of filling out profiles, and the problem of certain online dating users being inundated with messages.  This particularly advantageous online matchmaking method may have been known prior to the inventions claimed.  However, this method was not so pervasive as to be "conventional."

100.     Moreover, even if that matchmaking method was conventional, the inventions are directed to an improved interface for that method.

**B.   COUNT TWO:  INFRINGEMENT OF THE '023 PATENT BY MUZMATCH**

101.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

102.    Muzmatch directly infringes the '023 Patent by making and using a system that practices one or more claim of the '023 Patent.

103.    For example, independent claim 3 of the '023 Patent recites:

A system, comprising:

an interface operable to:

present a graphical representation of a first item of information of a plurality of items of information, the first item of information comprising a graphical representation of a first online dating profile associated with a first user, wherein the interface is further operable to present the graphical representation of the first item of information of the plurality of items of information as a first card of a stack of cards;

a processor coupled to the interface and operable to:

detect a gesture associated with the graphical representation of the first item of information, the gesture corresponding to a positive preference indication associated with the first item of information, the positive preference indication associated with the first item of information comprising an expression of approval for the first user associated with the first online dating profile, wherein the processor is further operable to detect a right swiping direction associated with the gesture;

store the positive preference indication associated with the first item of information in response to detecting the gesture; and

the interface further operable to:

automatically present a graphical representation of a second item of information of the plurality of items of information in response to the processor detecting the gesture, the second item of information comprising a graphical representation of a second online dating profile associated with a second user; and

automatically remove the graphical representation of the first item of information in response to detecting the gesture.

104.    Claim 4 of the '023 Patent recites:

The system of claim 3, wherein the interface is further operable to present user interface controls such that all user interface controls configured to cause another item of information of the plurality of items of information to be displayed are associated with performing an action on the first item of information.

105.    Muzmatch is the listed distributing company for the Muzmatch App on the Apple App Store and the Google Play Store.  Thus, Muzmatch directly infringes at least claims 1, 3, and 5 of the '023 Patent by making and/or using the Muzmatch system.

106.    A user device running the Muzmatch App practices all of the limitations of claim 3, which is representative of claims 1 and 5.  For example, the Muzmatch App comprises an interface that is operable to present a graphical representation of a first item of information of a plurality of items of information, the first item of information comprising a graphical representation of a first online dating profile associated with a first user.  Specifically, the Muzmatch App presents a graphical representation of a first online dating profile at least by showing a picture of a user associated with an online dating profile.  Muzmatch's interface is further operable to present the graphical representation of the first item of information (i.e., the graphical representation of the online dating profile) as a first stack of cards.  Specifically, Muzmatch's graphical interface presents dating profiles in a stacked, card-based format:



107.    The Muzmatch App is designed to be installed and operated on mobile devices like iOS mobile devices and Android mobile devices.  Those mobile devices comprise a processor that is coupled to their touchscreen displays.  The touchscreen display is used to allow users to interface with the Muzmatch App.  The processor performs the operations described below when it is executing the Muzmatch Mobile App instructions.

108.    When the Muzmatch App is downloaded and installed on a mobile device, the mobile device's processor is operable to detect a gesture associated with the graphical representation of the first item of information, the gesture corresponding to a positive preference indication associated with the first item of information, the positive preference indication associated with the first item of information comprising an expression of approval for the first user associated with the first online dating profile, wherein the processor is further operable to detect a right swiping direction associated with the gesture.  Muzmatch users may perform a dragging or sliding gesture on the top card of the stack of cards.  When a user performs this gesture to the right of the screen, the Muzmatch App detects that this gesture was performed.  The gesture is performed on a graphical representation of the first item of information, which is a graphical representation

of an online dating profile.  The fact that the gesture was in the right direction corresponds to a positive preference indication associated with that online dating profile comprises an expression of approval associated with that online dating profile.



109.    As shown above, the code comprising the Muzmatch App, when downloaded, installed, and operating on a user device renders the device's processor operable to detect a right swiping direction associated with the positive preference indication gesture.

110.    The code comprising the Muzmatch App also renders the device's processor operable to store that positive preference indication associated with the first item of information in response to detecting the gesture.  Before transmitting that a Muzmatch user has expressed a positive preference indication, the Muzmatch App will store that positive preference indication in memory of the Muzmatch user's device.

111.    The Muzmatch App also comprises an interface operable to automatically present a graphical representation of a second item of information of the plurality of items of information in response to the processor detecting the gesture, the second item of information comprising a graphical representation of a second online dating profile associated with a second user.  In the

Muzmatch App, in response to the processor detecting the positive indication gesture, the Muzmatch App automatically presents the entire graphical representation of a second online dating profile associated with a second user.  For example, after the first user expressed a positive preference indication regarding the first potential match ("Henna"), the Muzmatch App automatically presents a graphical representation of a second potential match ("Nafa") from the set of potential matches:



112.    The Muzmatch App also automatically removes the graphical representation of the first item of information from the graphical user interface in response to detecting the gesture.  In the above example, the graphical representation of Henna is removed without further involvement from the user.

113.    A user device running the Muzmatch App practices all of the limitations of claim 4.  For example, the Muzmatch App comprises a system with an interface that is further operable to present user interface controls such that all user interface controls configured to cause another item of information of the plurality of items of information to be displayed are associated with performing an action on the first item of information.  In the Muzmatch App, a user can cause the

app to display another item of information within the plurality of items of information (i.e., another online dating profile) when viewing the card stack only by indicating a preference indication on the first item of information.



114.    Muzmatch also indirectly infringes the '023 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging and instructing end-user customers to install and use the Muzmatch App in the United States.

115.    Muzmatch was aware of the '023 Patent at least because the '023 Patent was included in Match's lawsuit against Bumble.

116.    Muzmatch took the above actions intending to cause infringing acts by others.

117.    If Muzmatch did not know that the actions it has encouraged and continues to encourage constitute infringement of the '023 Patent, Muzmatch nevertheless subjectively believes there was and is a high probability that others have and will infringe the '023 Patent but has taken and is taking deliberate steps to avoid confirming that it is actively inducing infringement by others.

118.    Muzmatch also indirectly infringes the '023 Patent by contributing to infringement by others, such as end-users, by providing within the United States software components for operating the Muzmatch App.  These software components are, for example, the Muzmatch App, and the download package that contains the Muzmatch App.  Muzmatch's end-users directly infringed the '023 Patent by, for example, installing and using the Muzmatch App in the United States to use the Muzmatch system in the United States.  These software components are known by Muzmatch to be especially made or adapted for use in Muzmatch's infringing system.

119.    Muzmatch has known these components to be especially made or especially adapted for use in infringement of the '023 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Alternatively, Muzmatch subjectively believes there was and is a high probability that these components were especially made or especially adapted for use in an infringement of the '023 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use but has taken and is taking deliberate steps to avoid confirming the same.

120.    Muzmatch's infringement of the '023 Patent is and has been willful at least as of the filing of this Complaint.  At that point, Muzmatch at a minimum knew or had reason to know of certain facts which would lead a reasonable person to realize their actions were unreasonably risky with respect to infringement of the '023 Patent.  Muzmatch has not attempted to avoid infringement of the patent or to design around it.  And Muzmatch designed the Muzmatch App to mirror the Tinder app and its functionality specifically to compete with it and avoid a barrier to entry in the market.

121.    The inventions claimed in the '023 Patent are not directed to an abstract idea. Instead, the claims are directed to an improvement in computer and user interface functionality as

well as in online social networking.  *See* Bumble Order at 10 (holding that the claims of the '023 Patent "are directed to a new user interface" and "[t]hese innovations improve existing interface technology").

122.    Specifically, the inventors of the continuation-in-part aspect of the '023 Patent set out to improve the user-interface functionality in online dating apps.  Far from claiming the general concept of matchmaking or even mutual opt-in matchmaking on a computer or over the Internet, the '023 Patent recites a new, innovative interface design that reflects a non-conventional, concrete improvement in graphical interfaces for online dating.

123.    For example, claim 3 recites multiple specific, concrete aspects related to an improved interface.  The claim requires that the graphical representation of a dating profile be represented as the first card of a stack of cards, that the system be operable to detect a gesture corresponding to a positive preference indication of the dating profile, that the interface be operable to detect a right swiping direction associated with that positive preference gesture, that a graphical representation of a second online dating profile is automatically presented in response to detecting the positive preference gesture, and that the graphical representation of the first data profile is automatically removed.

124.    As with the '811 Patent, the requirements of this claim reflect a non-conventional, concrete improvement in how touch screen user interfaces interact with users sifting through and making binary choices.  Even if the general gesture of swiping was known in the prior art, the specific application of the swiping gesture to indicate a preference on a card-based online dating interface was unknown and unconventional and provides specific, concrete improvements to the interface.

125.    This interface improvement allows users to sift through more information, more quickly than previous interfaces addressing similar binary choice user decisions.   These efficiencies to user interaction revolutionized the world of online dating.

## C.    COUNT THREE:  INFRINGEMENT OF THE '854 PATENT BY MUZMATCH

126.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

127.    Muzmatch directly infringes the '854 Patent at least by making and using a system that practices one or more claim of the '854 Patent.

128.    For example, independent claim 1 of the '854 Patent recites:

A non-transitory computer-readable medium comprising instructions that, when executed by a processor, are configured to:

electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user;

electronically receive a first request for matching, the first request electronically submitted by a first user using a first electronic device;

determine from the plurality of user online-dating profiles a set of potential matches for the first user;

cause the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user;

receive from the first electronic device of the first user a first positive preference indication associated with the graphical representation of the second user on the graphical user interface, the first positive preference indication associated with a first gesture performed on the graphical user interface, wherein the first gesture comprises a first swiping gesture;

cause the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match;

receive from a second electronic device of the second user a positive preference indication regarding the first user;

determine to allow the first user to communicate with the second user in response to receiving from the first electronic device of the first user the first positive preference indication regarding the second user and receiving from the second electronic device of the second user the positive preference indication regarding the first user;

receive from the first electronic device of the first user a first negative preference indication associated with a graphical representation of a third potential match on the graphical user interface, the first negative preference indication associated with a second gesture performed on the graphical user interface, the third potential match corresponding to a third user, wherein the second gesture comprises a second swiping gesture different than the first swiping gesture;

without allowing communication between the first user and the third user, receive from the first electronic device of the first user a second positive preference indication associated with a graphical representation of a fourth potential match on the graphical user interface, the second positive preference indication associated with the first gesture performed on the graphical user interface, the fourth potential match corresponding to a fourth user;

receive from a third electronic device of the fourth user a second negative preference indication associated with a graphical representation of the first user; and

without allowing communication between the first user and the fourth user, receive from the first electronic device of the first user a third positive preference indication associated with a graphical representation of a fifth potential match on the graphical user interface, the third positive preference indication associated with the first gesture performed on the graphical user interface, the fifth potential match corresponding to a fifth user.

129.    Claim 2 of the '854 Patent recites:

The medium of Claim 1, wherein at least one or more of the plurality of user on-line dating profiles is associated with a social networking platform.

130.    Muzmatch is the listed distributing company for the Muzmatch App on the Apple App Store and the Google Play Store.  Thus, Muzmatch directly infringes at least claims 1, 4, 7, and 10 of the '854 Patent by making and/or using the Muzmatch system.

131.    Muzmatch's servers practice all of the limitations of claim 1, which is representative of claims 4, 7, and 10.  For example, one or more non-transitory computer-readable media reside on Muzmatch's servers that contain instructions that, when executed by one or more processors, are configured to perform the operations recited in the claim.

132.    Muzmatch's servers comprise instructions configured to electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user.  Through the account-setup process, Muzmatch receives from each user an online profile comprising traits of respective users.  The online profile is also received at Muzmatch's servers and downloaded to the Muzmatch App.  For example:



133.    Muzmatch's servers are configured to electronically receive a first request for matching, the first request electronically submitted by a first user using a first electronic device. For example, when the user registers with the Muzmatch App, the user then completes a profile requesting to be matched with certain other users that possess the preferred characteristics selected by the user.



134.    Muzmatch's servers are configured to determine from the plurality of user online-dating profiles a set of potential matches for the first user.  For example, in response to receiving the parameters set forth in the request for matching contained in the Muzmatch user's request, the Muzmatch App determines a set of potential matches for the requesting user based on parameters such as location, age, and gender:



135.    Muzmatch's servers are configured to cause the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user.  For example, Muzmatch causes the display of potential matches of other Muzmatch App users to appear on the first Muzmatch App user's graphical user interface.



136.   Muzmatch's servers are configured to receive from the first electronic device of the first user a first positive preference indication associated with the graphical representation of the second user on the graphical user interface, the first positive preference indication associated with a first gesture performed on the graphical user interface, wherein the first gesture comprises a first swiping gesture.  For example, a Muzmatch App user may affirmatively select (or reject) another Muzmatch App user by using gestures (i.e., sliding the potential match left or right).



137.    Muzmatch's servers are configured to cause the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match.  For example, after the first user expressed the positive preference indication regarding the first potential match ("Henna"), the Muzmatch App presents a graphical representation of a second potential match ("Nafa") instead of the graphical representation of Henna.



138.   Muzmatch's servers are configured to receive from a second electronic device of the second user a positive preference indication regarding the first user.  Muzmatch compares the selected preference of each potential match (i.e., of a first Muzmatch user and a second Muzmatch user), including making a determination whether the first and second Muzmatch users each expressed a positive preference for the other.  In this example, both users have expressed a positive preference for each other.  The Muzmatch App determines that this occurs and indicates to the users via the "It's a muzmatch!" screen.



139.    Muzmatch's servers determine to allow the first user to communicate with the second user in response to receiving from the first electronic device of the first user the first positive preference indication regarding the second user and receiving from the second electronic device of the second user the positive preference indication regarding the first user.  In the event that there is a mutual positive preference indication between the first user and the second user, Muzmatch allows the first user to communicate with the second user in response to receiving from the first electronic device of the first user the first positive preference indication regarding the second user and receiving from the second electronic device of the second user the positive preference indication regarding the first user.



140.    Muzmatch's servers are configured to receive from the first electronic device of the first user a first negative preference indication associated with a graphical representation of a third potential match on the graphical user interface, the first negative preference indication associated with a second gesture performed on the graphical user interface, the third potential match corresponding to a third user, wherein the second gesture comprises a second swiping gesture different than the first swiping gesture.  For example, Muzmatch receives from the first electronic device of the first user a first negative preference indication when the first user performs a "swiping" gesture in the left direction.



141.    Muzmatch's servers are configured to, without allowing communication between the first user and the third user, receive from the first electronic device of the first user a second positive preference indication associated with the first gesture performed on the graphical user interface, the fourth potential match corresponding to a fourth user.  For example, if the first Muzmatch user expressed a negative preference for a third Muzmatch user, the Muzmatch App does not normally allow the first and third users to communicate, but provides additional representations of users for the first user to indicate preferences for.



142.    Muzmatch's servers receive from a third electronic device of the fourth user a second negative preference indication associated with a graphical representation of the first user when a Muzmatch user affirmatively rejects the first Muzmatch user.

143.    Muzmatch's servers are configured to, without allowing communication between the first user and the fourth user, receive from the first electronic device of the first user a third positive preference indication associated with a graphical representation of a fifth potential match on the graphical user interface, the third positive preference indication associated with the first gesture performed on the graphical user interface, the fifth potential match corresponding to a fifth user.  For example, if another user expresses a negative preference for the first user or has not yet expressed a preference, the user can continue to indicate preferences on additional users by use of "swiping" gestures without Muzmatch allowing communication with the fourth user.

144.    Muzmatch's servers practice all of the limitations of claim 2.   For example, Muzmatch's servers are configured to perform the limitations of claim 1, wherein at least one or more of the plurality of user on-line dating profiles is associated with a social networking platform. When a Muzmatch user downloads and initially accesses the app, the user device is permitted and encouraged to associate his Muzmatch with the user's Facebook account.   Facebook is a social networking platform.   Muzmatch itself is also a social networking platform.



145.    Muzmatch also indirectly infringes the '854 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging and instructing end-user customers to install and use the Muzmatch App in the United States.

146.    Muzmatch was aware of the '854 Patent at least because of its inclusion in Match's lawsuit against Bumble.

147.    Muzmatch took the above actions intending to cause infringing acts by others.

148.    If Muzmatch did not know that the actions it has encouraged and continues to encourage constitute infringement of the '854 Patent, Muzmatch nevertheless subjectively believes there was and is a high probability that others have and will infringe the '854 Patent but

has taken and is taking deliberate steps to avoid confirming that it is actively inducing infringement by others.

149.    Muzmatch also indirectly infringes the '854 Patent by contributing to infringement by others, such as end-users, by providing within the United States software components for operating the Muzmatch App.  These software components are, for example, the Muzmatch App, and the download package that contains the Muzmatch App.  Muzmatch's end-users directly infringed the '854 Patent by, for example, installing and using the Muzmatch App in the United States to use the Muzmatch system in the United States.  These software components are known by Muzmatch to be especially made or adapted for use in Muzmatch's infringing system.

150.    Muzmatch has known these components to be especially made or especially adapted for use in infringement of the '854 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Alternatively, Muzmatch subjectively believes there was and is a high probability that these components were especially made or especially adapted for use in an infringement of the '854 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use but has taken and is taking deliberate steps to avoid confirming the same.

151.    Muzmatch's infringement of the '854 Patent is and has been willful at least as of the filing of this Complaint.  At that point, Muzmatch at a minimum knew or had reason to know of certain facts which would lead a reasonable person to realize their actions were unreasonably risky with respect to infringement of the '854 Patent.  Muzmatch has not attempted to avoid infringement of the patent or to design around it.  And Muzmatch designed the Muzmatch App to mirror the Tinder app and its functionality specifically to compete with it and avoid a barrier to entry in the market.

152.    The inventions claimed in the '854 Patent are not directed to an abstract idea. Instead, the claims are directed to an improvement in computer and user interface functionality, as well as in online social networking.

153.    Specifically, the inventors of the continuation-in-part aspect of the '854 Patent set out to improve the functionality in online dating apps.  Far from claiming the general concept of matchmaking or even mutual opt-in matchmaking on a computer or over the Internet, the '854 Patent recites a new, innovative configuration that reflects a non-conventional, concrete improvement in process related to online dating.

154.    For example, claim 1 recites multiple specific, concrete aspects related to an improved configuration.  The claim requires that online profiles be tied to traits of respective users, that sets of potential matches be presented to the users, that the system is operable to detect a gesture corresponding to a positive and negative preference indications regarding the dating profile dependent upon different swiping gestures, that the system determines that communications are allowed between two users who have indicated a positive preference for each other, that the system does not allow communications where at least one user has indicated a negative preference, and that the users are presented with multiple additional potential matches following each preference indication.

155.    As with the '811 and '023 Patents, the requirements of this claim reflect a non-conventional, concrete improvement in how touch screen user interfaces interact with users sifting through and making binary choices.  The specific directional dragging-gesture on a graphical representation of a user to denote positive, and of a dragging gesture in a different direction on the graphical representation to denote negative, in connection with a mutual opt-in matchmaking app, was a non-conventional, concrete improvement in how touch screen user interfaces interact with

users sifting through and making binary choices, such as indicating positive or negative preferences related to potential matches.  As with the '811 and '023 Patents, although the general gesture of "swiping" may have been known in the prior art, the specific application to a graphical representation of a user in the specific matchmaking context claimed, in order to make binary choices expressing a preference or lack thereof regarding potential matches, was unknown and unconventional.

156.    This interface improvement allows users to sift through more information, more quickly than previous interfaces addressing similar binary choice user decisions.   These efficiencies to user interaction revolutionized the world of online dating.  Scroll-based interfaces were prevalent and ubiquitous in the online dating world at the time of the inventions claimed in the '854 Patent.

157.    Although these interfaces were generally fine for their intended purposes, they suffered from drawbacks.

158.    For example, many users feel like scrolling can be difficult, particularly when scrolling on devices with small screens.

159.    Additionally, scroll-based systems tend to hinder the ability to show large photographs.  In the dating context, many users believe that viewing photographs of potential matches is one of the most significant aspects of making preference decisions.

160.    The innovations claimed in the CIP aspects of the '854 Patent solve these problems by providing an improved non-scroll-based interface thereby fostering more binary choice decisions and increased user engagement with the application.

161.    The innovations do this by describing the one-at-a-time, dragging-gesture based interface claimed in the '854 Patent.

162.     By requiring profiles to be viewed one at a time, the interface precludes users from deferring preference choices, which enables the system to obtain additional preferences concerning users than it might otherwise.

163.     Further, by allowing preference indications to be received by virtue of dragging-gesture known in the patent as a "swipe," the interface minimizes user movement, thus also fostering user engagement and more potential matches to be made.

164.     In the wake of the Tinder app's release, multiple third-party publications lauded Tinder's innovative card-based format.

165.     For example, a public project published in connection with a class at Davidson College describes the Tinder app's card-based interface as "[t]he most important and innovating [*sic*] aspect of the design of Tinder."  It further contrasts the interface as "an alternative to the traditional scrolling interface" and describes various advantages of the Tinder app's interface to scroll-based interfaces.  For example, it describes that "Tinder requires extremely little movement from its user in order to function" and that it "require[s] far less effort than other interfaces, which makes it more appealing to its users," which is particularly advantageous "[i]n a culture where speed and ease are paramount."  *See* **Exhibit H**.

166.     In another 2015 article from growthhackers.com, the author praised the Tinder app's "novel user experience," and "novel interface and interaction design."  The author acknowledged that "the way Tinder is built has everything to do with how it caught fire."  It describes "the big difference between Tinder and other mobile apps is how you navigate through potential matches.  Matches are presented like a virtual deck of cards that the user 'swipes' through," noting that the interface makes it "easy to do with one hand, making it perfect for moving quickly" while also providing "more screen real estate . . . for large pictures and more information,"

which "isn't feasible in a list format or on a small screen with lots of navigation options." *See* **Exhibit I**.

167.    In a 2017 article from innovationiseverywhere.com, describing the Tinder app's rise to success, the user interface was described as what "was different" from competitor applications at the time.  The article further describes that "Tinder's UI simplified the selection process of finding potential suitors to a binary option . . . .  Unlike other dating apps that require the user to plough through cumbersome lists, Tinder required only an input that registered as a 'Yes' or 'No' from the user." *See* **Exhibit J**.

**D.    COUNT FOUR:  TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114(a)**

168.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

169.    Match has received a federal registration for the mark SWIPE in connection with computer application software for mobile devices—software for social introduction and dating services.

170.    Match, through its predecessors-in-interest, first used the mark SWIPE in commerce on or around March 28, 2013, and continues to do so.

171.    Muzmatch, by using Match's SWIPE mark to compete with the Tinder app in the market for software for social introduction and dating services, has violated 15 U.S.C. § 1114.  As discussed above, Muzmatch is prominently using Match's SWIPE mark throughout the Muzmatch App and promotional activities.  Muzmatch's activities are causing, and, unless enjoined, will continue to cause, a likelihood of confusion and deception of members of the public, and, additionally, injury to Match's reputation and goodwill as reflected in the SWIPE mark. Muzmatch's use of the SWIPE mark will also actually deceive the public or is at least likely to

deceive or confuse the public regarding the source, sponsorship, and/or affiliation of the Muzmatch App.

172.    These actions have also materially damaged the value of Match's registered SWIPE mark.

173.    As a proximate result of Muzmatch's actions, Match has suffered damages, including but not limited to, lost revenue and loss of goodwill associated with its Tinder app.

174.    At least because of Muzmatch's competition with the Tinder app, Muzmatch's actions also demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Match's SWIPE mark.

175.    Match also has a federal registration for the Tinder flame rendered in white on an orange and pink field in connection with online dating software and social networking, introduction, and dating services ("Flame mark").

176.    Match through its predecessors-in-interest, has continuously used a variation of the Flame mark in connection with these services since as early as 2012.

177.    Muzmatch's new "It's a Match!" screen, which previously included a gray background, now includes a butterfly rendered in white on an orange and pink field.  Muzmatch is prominently using its butterfly rendered in white on an orange and pink field mark in its product offerings.  Muzmatch's activities are causing, and, unless enjoined, will continue to cause, a likelihood of confusion and deception of members of the public, and, additionally, injury to Match's reputation and goodwill.  Muzmatch's infringement of the Flame mark will also actually deceive the public or is at least likely to deceive or confuse the public regarding the source, sponsorship, and/or affiliation of Muzmatch's offerings.

178.    These actions have also materially damaged the value of Match's registered Flame mark.

179.    As a proximate result of Muzmatch's actions, Match has suffered damages, including but not limited to, lost revenue and loss of goodwill associated with its Tinder app.

180.    At least because of Muzmatch's competition with the Tinder app, Muzmatch's actions also demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Match's Flame mark.

181.    Match has received federal registrations for the marks MATCH and Design and MATCH.COM (the "Registered MATCH Marks") in connection with online dating software and social networking, introduction, and dating services.

182.    Match has continuously used its MATCH and Design mark in connection with these services since at least as early as 2014, and has continuously used its MATCH.COM mark since 1995.

183.    Muzmatch, by using Match's Registered MATCH Marks to compete with the Tinder app, Match app, and Match.com website in the market for software for social introduction and dating services, has violated 15 U.S.C. § 1114.  The name and mark MUZMATCH, and the domain name MUZMATCH.COM incorporate the Registered MATCH Marks in their entirety and/or are confusingly similar thereto.  Muzmatch's activities are causing, and, unless enjoined, will continue to cause, a likelihood of confusion and deception of members of the public, and, additionally, injury to Match's reputation and goodwill as reflected in the Registered MATCH Marks.  Muzmatch's use of the MUZMATCH mark and MUZMATCH.COM domain name will also actually deceive the public or is at least likely to deceive or confuse the public regarding the source, sponsorship, and/or affiliation of the Muzmatch App.

184.    Muzmatch has also registered a trademark, MUZMATCH, which is likely to cause confusion with, and thus infringes, Match's Registered MATCH Marks.

185.    These actions have also materially damaged the value of the Registered MATCH Marks.

186.    As a proximate result of Muzmatch's actions, Match has suffered damages, including but not limited to, lost revenue and loss of goodwill associated with the Registered MATCH Marks.

187.    Muzmatch's actions also demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with the Registered MATCH Marks.

**E.    COUNT FIVE:  FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125(a)**

188.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

189.    Match is the owner of word marks SWIPE, SWIPE LEFT, and SWIPE RIGHT in connection with internet-based dating and matchmaking and similar services since at least on around March 28, 2013.  Match has used and continues to use these marks throughout the United States.

190.    These marks are valid and enforceable and in full force and effect.

191.    As described above, Muzmatch uses Match's SWIPE, SWIPE LEFT, and SWIPE RIGHT marks prominently.  Muzmatch's doing so is likely to cause confusion or mistake or deceive the public as to the origin, sponsorship, or approval of the Muzmatch App.

192.    At least because of Muzmatch's competition with the Tinder app, Muzmatch's actions also demonstrate an intentional, willful, and malicious intent to trade on goodwill associated with the SWIPE, SWIPE LEFT, and SWIPE RIGHT word marks.

193.     These actions have caused damages to Match, including lost revenue as well as damages to the brand and associated goodwill.

194.     Match is the owner of word marks MATCH and MATCH.COM in connection with internet-based dating and matchmaking and similar services since at least 1995.  Match has used and continues to use these marks throughout the United States.

195.     As described above, the MUZMATCH name and mark and MUZMATCH.COM domain name incorporate the MATCH and MATCH.COM marks in their entirety and are confusingly similar thereto.  Muzmatch's use of the MUZMATCH mark for the same or similar services is likely to cause confusion or mistake or deceive the public as to the origin, sponsorship, or approval of the Muzmatch App.

196.     Muzmatch has also registered a trademark, MUZMATCH, which is likely to cause confusion with, and thus infringes, Match's MATCH and MATCH.COM marks.

197.     Muzmatch's actions also demonstrate an intentional, willful, and malicious intent to trade on goodwill associated with the above marks.

198.     These actions have caused damages to Match, including lost revenue as well as damages to the brand and associated goodwill.

199.     Match is the owner of wordmark SWIPE. MATCH. CHAT. in connection with internet-based dating and matchmaking and similar services since at least 2017.  Match has used this mark throughout the United States and consumers associate it with Match.

200.     As described above, Muzmatch uses Match's SWIPE. MATCH. CHAT. mark prominently.  Muzmatch's use is likely to cause confusion or mistake or deceive the public as to the origin, sponsorship, or approval of the Muzmatch App.

201.   At least because of Muzmatch's competition with the Tinder app, Muzmatch's actions also demonstrate an intentional, willful, and malicious intent to trade on goodwill associated with the SWIPE. MATCH. CHAT. mark.

202.   These actions have caused damages to Match, including lost revenue as well as damages to the brand and associated goodwill.

**F.    COUNT SIX:  UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)(1)(A)**

203.   Match incorporates by reference the preceding paragraphs as if fully set forth herein.

204.   As discussed above, Match's trademarks and trade dress are valid marks in full force and effect.

205.   Muzmatch knowingly and willfully used these marks and trade dress in commerce through the promotion of the Muzmatch App and in the Muzmatch App itself.

206.   Muzmatch's actions are likely to cause consumer confusion, cause consumer mistake, and/or deceive ordinarily prudent consumers as to the affiliation, connection, or association with, or sponsorship or approval of Match products because Muzmatch's actions suggest that its own app originates from, is sponsored by, is authorized by, or is otherwise connected with Match.

207.   These actions have materially damaged the value of Match's marks and trade dress.

208.   As a result, Match has suffered damages, including lost revenue and damage to goodwill associated with Tinder and the Match app and website.

209.   Muzmatch's actions have caused injury to Match, and Match is entitled to damages caused thereby, including punitive damages as a result of Muzmatch's malicious and willful actions.

### G.  COUNT SEVEN:  INFRINGEMENT OF TRADE DRESS UNDER 15 U.S.C. § 1125(a)

210.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

211.    Match is also the owner of legally protectable trade dress.  For example, the non-functional, design and appearance of the Tinder app's card stack, namely the appearance of a profile picture as a card on top of a stack of profile pictures being dragged at an angle off a screen, is either inherently distinctive or has acquired secondary meaning designating Match as the source of the product.

212.    Match has protectable trade dress in the non-functional, ornamental design of cards showing photographs tilted both left and right, as shown below:



213.    This is because the visual impression of the Tinder app is of cards being dragged off the screen in the exact same way.




214.    As described above, the appearance of this interface has been described as "famous" or "iconic" by multiple third-party publications.

215.    This interface was first used in commerce some time before September 1, 2012.

216.    By including this same non-functional ornamental design, the Muzmatch App is likely to cause confusion or mistake or to deceive the public as to the origin, sponsorship, or approval of the Muzmatch App.

217.    Match is also the owner of trade dress related to the "It's a Match!" screen, shown here in its various forms:

 

218.    Match first used the "It's a Match!" screen in commerce on August 2, 2012.

219.    As described above, Match has used this screen in various advertising materials, including the App Store, Google Play Store, and on YouTube in addition to its use as trade dress.

220.    This overall design of this screen is non-functional.

221.    As also discussed above, Muzmatch's similar screen is virtually identical to Match's trade dress as shown below.

  

222.    By including this same non-functional design, the Muzmatch App likely caused confusion or mistake or deceived the public as to the origin, sponsorship, or approval of the Muzmatch App.

223.    Match also has a federal registration for the Tinder flame rendered in white on an orange and pink field.  Muzmatch's new "It's a Match!" screen includes a butterfly rendered in white on an orange and pink field.

224.    At least because of Muzmatch's competition with the Tinder app, Muzmatch's actions also demonstrate an intentional, willful, and malicious intent to trade on goodwill associated with Match's trade dress.

225.    These actions have caused damages to Match in the form of lost revenue, as well as damages to Tinder's brand and associated goodwill.

**H.    COUNT EIGHT:  TRADEMARK DILUTION**

226.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

227.    Certain of Muzmatch's actions also constitute trademark and trade dress dilution by blurring under 15 U.S.C. § 1125(c).

228.    Match's wordmark SWIPE RIGHT is famous to the general public.

229.    As discussed above, the term "swipe right" is included in the Oxford English Dictionary, specifically associated with the Tinder app.

230.    "Swipe right," especially in the connection with "swipe left," is often described by third parties as a famous "cultural phenomenon."

231.    These third parties describe the cultural phenomenon specifically in reference to Match and the Tinder app.

232.    In light of Match's own extensive marketing as well as the descriptions of third parties, SWIPE RIGHT has become effectively a "household name" identifying the brand and the Tinder app.

233.    After Match's SWIPE RIGHT mark became famous, Muzmatch began using SWIPE RIGHT in connection with the Muzmatch App.  Muzmatch's routine use of the mark SWIPE RIGHT in connection with a direct competitor mobile dating service has caused and is likely to cause dilution by blurring, diluting the distinctiveness of SWIPE RIGHT as a brand signifier for Match.

234.    These actions have harmed the reputation and goodwill associated with Tinder.

235.    Muzmatch's dilution of Match's SWIPE RIGHT mark has been willful and intentional.

236.    Match's wordmarks MATCH and MATCH.COM are famous to the general public.

237.    In light of Match's own extensive marketing as well as the descriptions of third parties, MATCH and MATCH.COM each are effectively a "household name" identifying Match's brand.

238.    Long after Match's MATCH and MATCH.COM marks became famous, Muzmatch began using the MUZMATCH mark.  Use of the mark MUZMATCH in connection with a direct competitor mobile dating service has caused and is likely to cause dilution by blurring, diluting the distinctiveness of MATCH and MATCH.COM as brand signifiers for Match.

239.    These actions have harmed the reputation and goodwill associated with the MATCH and MATCH.COM brand.

240.    Muzmatch's dilution of the MATCH and MATCH.COM marks has been willful and intentional.

I.    **COUNT NINE:  CYBERPIRACY**

241.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

242.    Muzmatch has registered, trafficked in, and/or used the MUZMATCH.COM domain name.

243.    The MUZMATCH.COM domain name incorporates the MATCH and MATCH.COM marks in their entirety and is confusingly similar thereto.

244.    The MATCH and MATCH.COM marks were distinctive at the time Muzmatch registered the MUZMATCH.COM domain name.

245.    Muzmatch's acts complained of herein evidence its bad faith intent to profit from the MATCH and MATCH.COM marks.

246.    The acts of Defendants complained of herein constitute cyberpiracy in violation of Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

247.    Muzmatch's actions have caused injury to Match, and Match is entitled to damages caused thereby, including statutory damages pursuant to Section 25 of the Lanham Act, 15 U.S.C. § 1117, which provides for awards up to $100,000.

J.    **COUNT TEN:    TEXAS TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION**

248.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

249.    As discussed above, Match's trademarks and trade dress are valid marks in full force and effect.

250.    Muzmatch knowingly and willfully used these marks and this trade dress in commerce through the promotion of the Muzmatch App and in the Muzmatch App itself.

251.    Muzmatch's actions are likely to cause consumer confusion, cause consumer mistake, and/or deceive ordinarily prudent consumers as to the affiliation, connection, or association with, or sponsorship or approval of Match products because Muzmatch's actions suggest that its own app originates from, is sponsored by, is authorized by, or is otherwise connected with Match.

252.    These actions have materially damaged the value of Match's marks and trade dress.

253.    As a result, Match has suffered damages, including lost revenue and damage to goodwill associated with Tinder and the Match app and website.

254.    Muzmatch's actions have caused injury to Match, and Match is entitled to damages caused thereby, including punitive damages as a result of Muzmatch's malicious and willful actions.

**K.    COUNT ELEVEN:  TEXAS DILUTION**

255.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

256.    Muzmatch's use of the name and trademark MUZMATCH and of the trademark SWIPE RIGHT is likely to cause dilution of the famous MATCH, MATCH.COM, and SWIPE RIGHT marks.

257.    Muzmatch's conduct complained of herein constitutes willful trademark dilution of the MATCH, MATCH.COM, and SWIPE RIGHT marks in violation of Section 16.103 of the Texas Business and Commerce Code.

**VI.    DEMAND FOR JURY TRIAL**

258.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Match demands a trial by jury on all issues triable of right by a jury.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Match Group, LLC prays for the entry of a judgment from this Court as follows:

1.     Judgment in Plaintiff's favor and against Defendant on all causes of action alleged herein;

2.     A preliminary and/or permanent injunction restraining Defendant, and its agents, servants, employees, attorneys, successors and assigns, and all persons, firms, and corporations acting in concert with it, from directly or indirectly violating Plaintiff's patent rights, its rights under the Lanham Act, and its rights arising from common law unfair competition.

3.     Cancellation of U.S. Reg. No. 5,002,324 for the mark MUZMATCH under 15 U.S.C. § 1119.

4.     For Defendant to be ordered to transfer the MUZMATCH.COM domain name and any similar domain names to Match, or that the Court order the forfeiture or cancellation of the domain name.

5.     For damages in an amount to be proven at trial, including but not limited to:

 a.  Damages assessed against Defendant pursuant to the Lanham Act, including compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits;

 b.  Damages under 35 U.S.C. § 284, including enhancement and including supplemental damages for any continuing post-verdict infringement up until entry of final judgment, with an accounting, as necessary;

 c.  Damages for Defendant's common law unfair competition, including punitive damages;

d.  For Plaintiff's reasonable and necessary attorney's fees;

e.  For costs of suit incurred herein, including all disbursements;

f.  For pre-judgment and post-judgment interest on the damages awarded;

g.  If an injunction is not granted, that Plaintiff be awarded an ongoing licensing fee; and

h.  For such other and further relief, in law or in equity, as the Court may deem to be just and proper.

Dated:  February 12, 2021              Respectfully submitted,

*/s/Robert Greeson*

Robert Greeson (*pro hac pending*)
Texas Bar No. 24045979
robert.greeson@nortonrosefulbright.com
Brett C. Govett
Texas Bar No. 08235900
brett.govett@nortonrosefulbright.com
James Stephen Renard
Texas Bar No. 16768500
james.renard@nortonrosefulbright.com
Jacqueline G. Baker
Texas Bar No. 24109609
jackie.baker@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
Facsimile:  (214) 855-8200


Erik Janitens (*pro hac pending*)
Texas Bar No. 24097878
erik.janitens@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Facsimile:  (713) 651-5246


Stephanie Schmidt
Texas Bar No. 24106406
stephanie.schmidt@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 536-3051
Facsimile:  (512) 536-4598

**NORTON ROSE FULBRIGHT US LLP**

*Attorneys for Plaintiff Match Group, LLC*