**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **MATCH GROUP, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Case No. 6:21-CV-00147** |
| | § | |
| **MUZMATCH LIMITED,** | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANT MUZMATCH LIMITED'S MOTION TO DISMISS**
**MATCH GROUP, LLC'S COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ...................................................................................................... 1

II.    FACTUAL BACKGROUND ..................................................................................... 2

III.   LEGAL STANDARD ............................................................................................... 3

IV.   ARGUMENT ............................................................................................................ 5

   A.   The Court Should Dismiss the '854 Patent Because It Is Patent-Ineligible ..................... 5

       1.   The '854 Patent Fails to Survive Step One of *Alice* ..................................... 5

       2.   The '854 Patent Lacks an Inventive Concept ............................................ 9

   B.   The Court Should Dismiss the '811 Patent Because It Is Patent-Ineligible..................... 12

       1.   The '811 Patent Fails to Survive Step One of *Alice* ................................... 12

       2.   The '811 Patent Lacks an Inventive Concept .......................................... 15

   C.   The Court Should Dismiss the '023 Patent Because It Is Patent-Ineligible ..................... 16

       1.   The '023 Patent Fails to Survive Step One of *Alice* ................................... 16

       2.   The '023 Patent Lacks an Inventive Concept .......................................... 19

V.    CONCLUSION........................................................................................................ 20

## **TABLE OF AUTHORITIES**

**Cases**                                                                  **Page(s)**

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*,
　　728 F.3d 1336 (Fed. Cir. 2013)..................................................................10

*Affinity Labs of Tex., LLC v. Amazon.com Inc.*,
　　2015 WL 3757497 (W.D. Tex. June 12, 2015) ..........................................5

*Alice Corp. v. CLS Bank International*,
　　573 U.S. 208 (2014)............................................................... *passim*

*Apple Inc. v. Ameranth, Inc.*,
　　842 F.3d 1229 (Fed. Cir. 2016)............................................................4, 19

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
　　569 U.S. 576 (2013)..................................................................................4

*Berkheimer v. HP Inc.*,
　　881 F.3d 1360 (Fed. Cir. 2018)................................................................3

*Bilski v. Kappos*,
　　561 U.S. 593 (Fed. Cir. 2010)...............................................................3, 5

*BSG Tech LLC v. BuySeasons, Inc.*,
　　899 F.3d 1281 (Fed. Cir. 2018)..............................................................19

*Cleveland Clinic Found. v. True Health Diags.*,
　　859 F.3d 1352 (Fed. Cir. 2017)................................................................3

*Content Extraction v. Wells Fargo Bank*,
　　776 F.3d 1343 (Fed. Cir. 2014)..............................................................10

*Credit Acceptance Corp. v. Westlake Servs.*,
　　859 F.3d 1044 (Fed. Cir. 2017)..............................................................16

*CyberSource Corp. v. Retail Decisions, Inc.*,
　　654 F.3d 1366 (Fed. Cir. 2011)................................................................4

*Elec. Power Grp. LLC v. Alstom S.A.*,
　　830 F.3d 1350 (Fed. Cir. 2016)..............................................................17

*I/P Engine, Inc. v. AOL, Inc.*,
　　576 F. App'x 982 (Fed. Cir. 2014) ...........................................................3

*Intell. Ventures I, LLC v. Capital One Fin. Corp.*,
　　850 F.3d 1332 (Fed. Cir. 2017).........................................................9, 15

*Intell. Ventures I, LLC v. Symantec Corp.*,
   838 F.3d 1307 (Fed. Cir. 2016).................................................................6

*Jedi Techs., Inc. v. Spark Networks, Inc.*,
   2017 WL 3315279 (D. Del. Aug. 3, 2013) .................................................5

*KomBea Corp. v. Noguar LC*,
   2014 WL 7359049 (D. Utah Dec. 23, 2014)..............................................5

*Lumen View Tech. LLC v. Findthebest.com*,
   984 F. Supp. 2d 189 (S.D.N.Y. 2013)........................................................6

*Match Grp., LLC v. Bumble Trading Inc.*,
   Case No. 6:18-CV-80 (W.D. Tex.) ....................................................1, 11

*Match Grp., LLC v. TanTan Ltd.*,
   Case No. 6:18-CV-81 (W.D. Tex.) ...........................................................1

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   566 U.S. 66 (2012)....................................................................................4

*Morales v. Square, Inc.*,
   75 F. Supp. 3d 716 (W.D. Tex. 2014)........................................................5

*Mortgage Grader, Inc. v. First Choice Loan Services Inc.*,
   811 F.3d 1314, 1322 (Fed. Cir. 2016)........................................................6

*Move, Inc. v. Real Est. All. Ltd.*,
   2018 WL 656377 (Fed. Cir. Feb. 1, 2018)......................................16, 17, 20

*MySpace, Inc. v. Graphon Corp.*,
   672 F.3d 1250 (Fed. Cir. 2012)...................................................12, 16, 20

*OIP Techs. v. Amazon.com Inc.*,
   788 F.3d 1359 (Fed. Cir. 2015)................................................................16

*Planet Bingo, LLC v. VKGS LLC*,
   576 F. App'x 1005 (Fed. Cir. 2014) ...................................................17, 19

*RecogniCorp v. Nintendo Co.*,
   855 F.3d 1322 (Fed. Cir. 2017).................................................................9

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018)...............................................................18

*Symantec Corp. v. Zscaler, Inc.*,
   2018 WL 3537201 (N.D. Cal. Jul. 23, 2018).................................12, 16, 20

*Synopsys, Inc. v. Mentor Graphics Corp.*,
  839 F.3d 1138 (Fed. Cir. 2016)............................................................................4

*In re TLI Commc'ns LLC Patent Litig.*,
  823 F.3d 607 (Fed. Cir. 2016)............................................................................18

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
  887 F.3d 1376 (Fed. Cir. 2018)..........................................................................17

*W. View Res., LLC v. Audi AG*,
  685 F. App'x 923 (Fed. Cir. 2017) .......................................................................5

*Walker Digital, LLC v. Google, Inc.*,
  66 F. Supp. 3d 501 (D. Del. 2014).......................................................................6

**Statutes**

35 U.S.C. § 101 ............................................................................................3, 19

## I.    INTRODUCTION

This is not the first time that this Court will have heard this story.[1]  After Plaintiff Match Group, LLC ("Match") failed to acquire Defendant Muzmatch Limited ("Muzmatch") at a price much lower than fair market value, Match has now sued Muzmatch on the basis of several claims without merit.  Match filed this lawsuit against Muzmatch, as it has against other matchmaking mobile apps, asserting these categories of claims: (1) patent infringement; (2) trademark and trade dress; (3) unfair competition; and (4) cyber piracy.  Despite Match's accusations, Muzmatch has no desire to be associated with Match or Tinder and instead promotes itself as different from other dating apps, connecting members with a perfect, lifelong partner while considering their Islamic religious beliefs.  Although each of Match's claims are lacking, which Muzmatch will show on the merits in this case, the Court should dismiss the patent-infringement claims on their face, according to Rule 12(b)(6).

Muzmatch respectfully requests that the Court narrow the claims in this suit to get to the heart of the trademark dispute—and thus dismiss the patent-infringement claims pursuant to 35 U.S.C. § 101.[2]  The claims of U.S. Patent Nos. 10,203,854 (the "'854 Patent"), 9,733,811 (the "'811 Patent"), and 9,959,023 (the "'023 Patent") (collectively, the "Patents-in-Suit") are patent ineligible because they are directed to the abstract concepts of matchmaking and picking cards out of a stack.  The asserted claims of the '854 and '811 Patents are trying to monopolize the economic practice of matching people according to mutual attraction (or not connecting because of lack of attraction), and the patents carry this long-standing business practice simply through the Internet using computer devices.  The '023 Patent claims perform the abstract concept of looking through

---

[1] *See generally Match Grp., LLC v. Bumble Trading Inc.*, Case No. 6:18-CV-80 (W.D. Tex.); *Match Grp., LLC v. TanTan Ltd.*, Case No. 6:18-CV-81 (W.D. Tex.).

[2] Although Muzmatch files a partial motion to dismiss, counsel for Match has agreed that Muzmatch need not answer in this suit until the Court resolves this motion.

a stack of profile cards one at a time and expressing interest in a card by making a gesture to the right using a generic processing device. The Patents-in-Suit do not solve any unique technological problem to overcome their abstract idea, so under the Supreme Court's precedent established in *Alice Corp. v. CLS Bank International*, the Patents-in-Suit are invalid for lack of patentable subject matter. 573 U.S. 208 (2014).

## II.     FACTUAL BACKGROUND

Match filed its Complaint on February 12, 2021, alleging Muzmatch's infringement of the Patents-in-Suit. Dkt. 1.

**The '854 Patent.** The '854 Patent, a continuation of the '811 Patent, includes four independent claims. Dkt. 1 Ex. C. Match alleges Muzmatch's practice of all the limitations of claim 1 (and its dependent claims), which is representative of independent claims 4, 7, and 10. *Id.* ¶ 128, 130-31. Claim 1 is directed at a "non-transitory computer-readable medium," claim 4 is directed at a "system," claim 7 is a method claim, and claim 10 is directed at a "system." *See* Ex. 1, '854 Patent. Each claim is very similar in scope. In fact, the infringement allegations associated with each claim are identical. *See* Dkt. 1 ¶ 131. Although not drafted identically, the limitations of claims 4, 7, and 10 mirror the steps in claim 1 and provide little new substance. Thus, as Match admits, claim 1 is representative of claims 4, 7, and 10. Dkt. 1 ¶ 131.[3]

**The '811 Patent.** The '811 Patent includes three independent claims. Dkt. 1 Ex. A. Match also alleges that Muzmatch practices all the limitations of claim 1 (and its dependent claims), which is representative of independent claims 4 and 7. *Id.* ¶ 66. Claim 1 is a method claim, claim 4 is directed to "a non-transitory computer readable medium," and claim 7 is directed to a system.

---

[3] Dependent claims 2, 5, 8, and 11 are substantially the same. Dependent claims 3, 6, 9, and 12 are substantially the same. For these reasons, claim 2 is representative of claims 5, 8, and 11, and claim 3 is representative of claims 6, 9, and 12. *See generally* Ex. 1.

*See id.*   Match admits that each claim is similar in scope, and the infringement allegations associated with each claim are identical.  *Id.*[4]

**The '023 Patent.**   The '023 Patent, a continuation of the '811 Patent, includes three independent claims.  Dkt. 1 Ex. B.  Match also alleges Muzmatch's practice of all the limitations of claim 3 (and its dependent claim), which is representative of independent claims 1 and 5.  *Id.* ¶ 105.  Claim 3 is a system claim, claim 1 is a method claim, and claim 5 is directed to a "non-transitory computer readable medium."  *See id.* Ex. B.  Each claim is similar in scope, and the infringement allegations associated with each claim are identical.  *Id.*[5]

### III.    LEGAL STANDARD

Patent eligibility under 35 U.S.C. § 101 is a question of law.  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).  It is a "threshold" issue that the Court should consider before other conditions of patentability.  *See Bilski v. Kappos*, 561 U.S. 593, 602 (Fed. Cir. 2010).  Accordingly, the Federal Circuit has "repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced."  *Cleveland Clinic Found. v. True Health Diags.*, 859 F.3d 1352, 1360 (Fed. Cir. 2017).  Early resolution serves to "spare both litigants and courts years of needless litigation."  *I/P Engine, Inc. v. AOL, Inc.*, 576 F. App'x 982, 996 (Fed. Cir. 2014).

Section 101 of the Patent Act defines eligibility and provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent."  35 U.S.C. § 101.  In construing the scope of this section, the Supreme Court has recognized certain exceptions: "[l]aw of nature,

---

[4] Dependent claims 2, 5, and 8 are substantially the same.  Dependent claims 3, 6, and 9 are substantially the same. Thus, claim 2 is representative of claims 5 and 8, and claim 3 is representative of claims 6 and 9.  *See generally* Ex. 2.
[5] Dependent claims 2, 4, and 6 are substantially the same.  Thus, claim 2 is representative of claims 4 and 6.  *See generally* Ex. 3.

natural phenomena, and **abstract ideas** are not patentable." *Alice*, 573 U.S. at 216 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013)) (emphasis added). The abstract-ideas exception includes mental process and traditional ways of analyzing information, fundamental economic practices long prevalent in our system of commerce, long-standing commercial practices, and methods of organizing human activity. *Id.* at 219; *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011).

Following *Alice*, courts apply a two-step framework to decide whether claims are patent-eligible. The first step is to "determine whether the claims at issue are directed to . . . patent-ineligible concepts," such as abstract ideas. *Alice*, 573 U.S. at 218. "The § 101 inquiry must focus on the language of the Asserted Claims themselves." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) (internal citations omitted). For computer-based claims, this first step asks whether the claims focus on a "specific means or method that improves the relevant technology," which may pass muster under § 101, or on a "result or effect that itself is the abstract idea and merely invoke generic processes and machinery," which cannot. *Apple Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) (internal citations omitted). If the claims are directed to an abstract idea, then the inquiry proceeds to a second step. In step two, the court must consider the elements of the claim both individually and as an ordered combination to determine whether the claims contain an "inventive concept" sufficient to "transform the nature of the claim into a patent-eligible application." *Alice*, 573 U.S. at 218. To survive the second step, a claim must include "additional features" ensuring that the claim does "more than simply stat[e] the abstract idea while adding the words 'apply it.'" *Id.* at 221 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72 (2012)). A claim that only adds "well-understood, routine, conventional activity" does not constitute an "inventive concept." *Mayo*, 566 U.S. at 73.

## IV.    ARGUMENT

Taking the allegations in Match's Complaint as true, the Court should dismiss Match's patent-infringement claims (counts 1–3) because the asserted claims of the Patents-in-Suit are directed to an abstract idea.  Each of the claims in the Patents-in-Suit are directed and relate to the business practice of matchmaking or reviewing a stack of profile cards, and nothing in the asserted claims of the Patents-in-Suit shows an inventive concept.  Thus, the Court should dismiss the claims under Rule 12(b)(6).  *See Alice*, 573 U.S. at 219; *Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 2015 WL 3757497, at *5 (W.D. Tex. June 12, 2015).

**A.    The Court Should Dismiss the '854 Patent Because It Is Patent-Ineligible**

**1.    <u>The '854 Patent Fails to Survive Step One of *Alice*</u>**

*First*, the asserted claims of the '854 Patent relate to connecting people with potential matches based on their mutual attraction to each other, or not connecting them because of the lack of mutual attraction—an abstract idea.  Several courts have held that well-known methods and business practices involving the mere organization of human activity, such as connecting or not connecting two people, are not patentable.  *See Alice*, 573 U.S. at 219 (mitigating settlement risk); *Bilski v. Kappos*, 561 U.S. 593, 611-12 (2010) (hedging); *W. View Res., LLC v. Audi AG*, 685 F. App'x 923 (Fed. Cir. 2017) (receiving or collecting data queries, analyzing the data query, retrieving and processing the information constituting a response to the initial data query, and generating a visual response to the initial data query); *Morales v. Square, Inc.*, 75 F. Supp. 3d 716, 724-26 (W.D. Tex. 2014) ("a claim is directed to an abstract idea when it describes a fundamental concept or longstanding practice"); *KomBea Corp. v. Noguar LC*, 2014 WL 7359049, at *1, *7 (D. Utah Dec. 23, 2014) (automating telemarking calls personalized to a potential customer).

Courts consistently find that matchmaking is the type of organizational practice that typically fails a challenge under § 101.  *Jedi Techs., Inc. v. Spark Networks, Inc.*, 2017 WL

3315279, at *20-21 (D. Del. Aug. 3, 2013) ("[t]he concept of matchmaking is certainly not novel and has been performed by humans for a very long time"); *Walker Digital, LLC v. Google, Inc.*, 66 F. Supp. 3d 501, 508-09 (D. Del. 2014) ("none of these [claim] limitations adds anything meaningful to the basic concept of controlled exchange of information about people as historically practiced by matchmakers"); *Lumen View Tech. LLC v. Findthebest.com*, 984 F. Supp. 2d 189, 198, 200 (S.D.N.Y. 2013) (invalidating patent directed to abstract idea of "bilateral and multilateral matchmaking"). Indeed, humans have performed the abstract idea of matchmaking claimed in the '854 Patent long before the invention of computers, which conveys that the claims are directed to an abstract idea. *See Intell. Ventures I, LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016).

In *Mortgage Grader, Inc. v. First Choice Loan Services Inc.*, the Federal Circuit explained that "meritorious" § 101 defenses after *Alice* are "most likely to occur with respect to patent claims that involve implementations of economic arrangements using generic computer technology." 811 F.3d 1314, 1322 (Fed. Cir. 2016). Like *Mortgage Grader*, the '854 Patent's claims are directed to an "economic arrangement" implemented using "generic computer technology" for matchmaking. For example, a human matchmaker could perform each of the steps in the claimed elements of independent claim 1, showing that the claims are directed to the fundamental economic practice of matchmaking:

| Claim 1 | Matchmaker |
|---|---|
| A non-transitory computer-readable medium comprising instructions that, when executed by a processor, are configured to: | A matchmaker. |
| electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user; | The matchmaker receives profiles, including pictures, backgrounds, and résumés, of different clients from various social-media sites and networks. |
| electronically receive a first request for matching, the first request electronically | The matchmaker receives a request from Client A for matching. |

| submitted by a first user using a first electronic device; | |
|---|---|
| determine from the plurality of user online-dating profiles a set of potential matches for the first user; | The matchmaker reviews other clients and determines a set of potential matches for Client A. |
| cause the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user; | The matchmaker presents Client A with a physical stack of potential matches.  The matchmaker presents a first potential match to Client A with background and information of the first potential match. |
| receive from the first electronic device of the first user a first positive preference indication associated with the graphical representation of the second user on the graphical user interface, the first positive preference indication associated with a first gesture performed on the graphical user interface, wherein the first gesture comprises a first swiping gesture; | The matchmaker determines that Client A is interested in the first potential match by having Client A put that match in a separate pile.  When Client A puts that match in a separate pile, this reflects that Client A is interested in the first potential match. |
| cause the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match; | When Client A removes that potential match from the stack, a second potential match will be shown next in the stack, which was underneath the first potential match. |
| receive from a second electronic device of the second user a positive preference indication regarding the first user; | The matchmaker receives notice from the first potential match that the first potential match is interested in Client A. |
| determine to allow the first user to communicate with the second user in response to receiving from the first electronic device of the first user the first positive preference indication regarding the second user and receiving from the second electronic device of the second user the positive preference indication regarding the first user; | The matchmaker provides Client A and the first potential match with each other's contact information because the interest is confirmed for both Client A and the first potential match. |
| receive from the first electronic device of the first user a first negative preference indication associated with a graphical representation of a third potential match on the graphical user interface, the first negative preference indication associated with a second gesture performed on the graphical user interface, the third potential match corresponding to a third user, wherein the second gesture comprises a | The matchmaker directs Client A to put in a separate pile (different from the first pile) a third potential match in which Client A is not interested. |

| | |
|---|---|
| second swiping gesture different than the first swiping gesture; | |
| without allowing communication between the first user and the third user, receive from the first electronic device of the first user a second positive preference indication associated with a graphical representation of a fourth potential match on the graphical user interface, the second positive preference indication associated with the first gesture performed on the graphical user interface, the fourth potential match corresponding to a fourth user; | The matchmaker will not allow Client A to communicate with the third potential match. But Client A can put a fourth potential match in the same pile as the first potential match, showing Client A's interest in the fourth potential match. |
| receive from a third electronic device of the fourth user a second negative preference indication associated with a graphical representation of the first user; and | The matchmaker receives notice from the fourth potential match that the fourth potential match is not interested in Client A. |
| without allowing communication between the first user and the fourth user, receive from the first electronic device of the first user a third positive preference indication associated with a graphical representation of a fifth potential match on the graphical user interface, the third positive preference indication associated with the first gesture performed on the graphical user interface, the fifth potential match corresponding to a fifth user. | The matchmaker will not allow Client A to communicate with the fourth potential match. However, Client A can still put the fourth potential match in the same pile as the first potential match, showing Client A's interest in the fourth potential match. |

Moreover, the specification of the '854 Patent expressly characterizes the patent's purported invention as a computerization of steps performed by a human matchmaker, such as the presentation of paper cards to clients. For example, the patent describes embodiments that use a graphical representation of each match in the form of a "'card' representing the suggested user." Ex. 1, '854 Patent, at 21:30-31. "[U]sers may navigate through the set of presented users by swiping through stack of cards." *Id*. at 22:11-12. This underscores the nontechnical and abstract nature of the claims.

The dependent claims are similarly abstract. *See id.* claims 2, 3, 5, 6, 8, 9, 11, 12; *see also Fairwarning*, 839 F.3d at 1096. Dependent claims 2, 5, 8, and 11 are directed to the abstract idea

of obtaining information about each user from a social-networking site, which is much like a résumé or information sheet, and something that a human matchmaker can also obtain.  Dependent claims 3, 6, 9, and 12 are directed to the abstract idea of notifying a person of a match based on mutual attraction, which is something that human matchmakers have done for years.  *See id.* claims 3, 6, 9, 12.

The asserted claims of the '854 Patent are also directed to an abstract idea because they do not convey a specific technological improvement of computer functionality.  Indeed, the claims are not directed to technology at all.  Instead, they refer to a nontechnical method of matchmaking implemented on a generic computer.  *See, e.g.*, *id.* claim 1 (a computer-readable medium comprising instruction to "electronically receive a plurality of user online-dating profiles"), 4 ("A system for profile matching"), 7 ("A computer implemented method of profile matching"), 10 ("A System for profile matching").  The claims focus on the abstract idea of matching individuals and allowing communication based on mutual attraction or interest, and not improving the functionality of a computer.  Limiting the '854 Patent's alleged invention to a particular technological environment does "not make [its] abstract concept any less abstract under step one." *Intell. Ventures I, LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017).

Thus, for these reasons, the Court should find that the claims of the '811 Patent are directed to the abstract idea of matchmaking and fail step one of the *Alice* test.

### 2. The '854 Patent Lacks an Inventive Concept

*Second*, the asserted claims of the '854 Patent lack inventive concept.  The second step in the *Alice* analysis requires the Court to determine whether the claims contain "an inventive concept sufficient to transform the claimed abstract idea into a patent eligible application."  *Alice*, 573 U.S. at 221 (internal citations and quotations omitted).  "To save a patent at step two, an inventive concept must be evident in the claims."  *RecogniCorp v. Nintendo Co.*, 855 F.3d 1322, 1326-27

(Fed. Cir. 2017); *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013). Nothing in the asserted claims saves the claims from the second step of *Alice*.

Here, the asserted claims do not recite any inventive concept but rather recite the performance of the abstract idea using previously invented generic computer, smartphone, and internet features such as "a computer," "online-dating profiles," "a social networking platform," an "electronic device," "a graphical user interface," "swiping," "a non-transitory computer readable medium," "a processor," and "an interface." Ex. 1, '854 Patent, claims 1, 4, 7, 10. These are nothing more than generic descriptions of computer components and functions that do not rise to the level of an inventive concept, either individually or as an ordered combination. *See Content Extraction v. Wells Fargo Bank*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014) (quoting *Alice*, 573 U.S. at 221 (a computer in a computer-implemented invention "must involve more than performance of 'well-understood, routine [and] conventional activities previously known to the industry'" to be meaningful)). Courts have repeatedly rejected claims as non-inventive that recite generic components. *See, e.g.*, *Alice*, 573 U.S. at 221-26 (rejecting argument that recitation of a "data processing system," "communications controller," or "data storage unit" conferred patentability); *Fairwarning*, 839 F.3d at 1096 ("non-transitory computer-readable medium" and "microprocessor"). Similarly, none of the generic computer components that the '854 Patent's claims recite transforms the abstract idea into "something more." *See Alice*, 573 U.S. at 216.

The specification of the '854 Patent confirms that such features are generic and fail to provide an inventive concept. For example, the specification describes the "social networking platform" generically as "a service which stores profiles of its users." Ex. 1, '854 Patent, at 16:23-25. Similarly, the "interface" (or graphical user interface) is shown in the specification as a generic box. *Id.* fig. 1B box 16. According to the specification, the graphical user interface "may

be provided in conjunction with" several electronic devices, such as "a cellular telephone, an electronic notebook, a laptop, a personal digital assistant (PDA) or any other suitable device (wireless or otherwise)." *Id.* at 4:8-11.  The interface itself "may [] comprise any suitable interface for a human user such as a video camera, a microphone, a keyboard, a mouse, or any other appropriate equipment according to particular configurations and arrangements" (*id.* at 4:15-18) or also may comprise "a touch screen interface operable to detect and receive touch input such as a tap or a swiping gesture" (*id.* at 19:52-54).

Moreover, this Court has construed some of the claim terms at issue in a prior case.  In that case, this Court held that several of these terms should be given their plain and ordinary meaning, proving the non-inventive generic components within these claims.  *Match Group, LLC v. Bumble Trading, Inc.*, Case No. 6:18-cv-80 (W.D. Tex. Aug. 15, 2019) (Dkt. 107) (construing "graphical representation," "social networking platform," and "text area" as having the plain and ordinary meaning that a person of ordinary skill in the art would ascribe to it).  Although Muzmatch does not believe that claim construction is necessary to resolve this Motion, if it were—and if the Court gave the same constructions—such language underscores the lack of technological invention within the patent's claims, and the Court should reject any arguments by Match that it somehow improves a user interface, as the Court already ascribed to these terms their ordinary meaning.  *Id.*

The Complaint emphasizes the use of "swiping" in the context of online dating, a concept that is not inventive.  Match concedes that "the general dragging gesture of swiping may have been known in the prior art."  Dkt. 1 ¶ 155.  In truth, "swiping" is merely one of many known ways to interact with a computer akin to pressing a button, which the patent admits.  *See* Ex. 1, '854 Patent, at 19:48-54, 22:8-19, 22:53-55.  Thus, the specification contains no detailed technical description of "swiping" or how to implement it.  Further, the Federal Circuit explained that "[a]n inventor is

-11-

entitled to claim in a patent what he has invented, but no more." *MySpace, Inc. v. Graphon Corp.*, 672 F.3d 1250, 1256 (Fed. Cir. 2012). If something is not detailed in the specification, it cannot be something that the patentee invented and cannot serve as an inventive concept. *See id.*; *Alice*, 573 U.S. at 220-21; *see also Symantec Corp. v. Zscaler, Inc.*, 2018 WL 3537201, at *3 (N.D. Cal. Jul. 23, 2018) (collecting cases finding patents ineligible where the specification is silent on the alleged inventive concept). Because the specification of the '854 Patent discloses no algorithm, design, or means of implementing "swiping," it must necessarily involve only conventional and routine steps of the type that cannot confer patent eligibility.

In sum, the elements of the claims of the '854 Patent include no inventive concept that would render any of the claims patent-eligible.

**B.    The Court Should Dismiss the '811 Patent Because It Is Patent-Ineligible**

**1.    The '811 Patent Fails to Survive Step One of *Alice***

*First*, like the '854 Patent, the '811 Patent relates to matchmaking, which is similarly not patentable. *See supra* § IV(A)(1). Like the '854 Patent, a human matchmaker could perform each of the steps in the claimed elements of independent claim 1 in the '811 Patent, showing that the claims are directed to a fundamental economic practice:

| Claim 1 | Matchmaker |
|---|---|
| A computer implemented method of profile matching, comprising: | A matchmaker. |
| electronically receiving a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform; | The matchmaker receives several pictures, backgrounds, and résumés of different clients from various social-media sites and networks. |
| electronically receiving a first request for matching, the first request electronically submitted by a first user using a first electronic device; | The matchmaker receives a request from Client A for matching. |
| determining a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request; | The matchmaker reviews other clients and determines a set of potential matches for Client A. |

| | |
|---|---|
| causing the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a user; | The matchmaker presents Client A with a physical stack of potential matches. The matchmaker presents a first potential match to Client A with background and information of the first potential match. |
| determining that the first user expressed a positive preference indication regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphical user interface; | The matchmaker determines that Client A is interested in the first potential match by having Client A put that match in a separate pile. When Client A puts that match in a separate pile, this reveals that Client A is interested in the first potential match. |
| in response to determining that the first user expressed the positive preference indication regarding the first potential match, automatically causing the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match; | When Client A removes that potential match from the stack, a second potential match will be shown next in the stack, which was underneath the first potential match. |
| determining that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match; | Once Client A shows that Client A is interested in the first potential match, the matchmaker contacts the first potential match and shares information on Client A with the first potential match. The first potential match expresses to the matchmaker an interest in Client A. |
| determining to enable initial communication between the first user and the second user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user; | The matchmaker provides Client A and the first potential match with each other's contact information because the interest is confirmed for both Client A and the first potential match. |
| in response to determining to enable initial communication between the first user and the second user, causing the graphical user interface to display the first user the graphical representation of the first potential match; | Because the matchmaker has provided contact information to both Client A and the first potential match, the matchmaker provides Client A with a card showing the first potential match to take home to keep track of those with confirmed interest. |
| determining that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture | The matchmaker directs Client A to put in a separate pile (different from the first pile) a third potential match in which Client A is not interested. |

| | |
|---|---|
| associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding to a third user; | |
| preventing communication between the first user and the third user after determining that the first user has expressed the negative preference indication regarding the third user; | The matchmaker does not provide Client A and the third potential match with each other's contact information, because Client A was not interested in the third potential match. |
| determining that the first user expressed a positive preference indication regarding a fourth potential match of the set of potential matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user; and | The matchmaker determines that Client A is interested in the fourth potential match because Client A moves the picture of the fourth potential match into the pile for interested matches (the first separate file). |
| preventing communication between the first user and the fourth user after determining the fourth user has expressed a negative preference indication regarding the first user. | The matchmaker does not provide Client A and the fourth potential match with each other's contact information, because the fourth potential match was not interested in Client A. |

The specification of the '811 Patent also expressly characterizes the patent's purported invention as a computerization of steps performed by a human matchmaker, such as the presentation of paper cards to clients. For example, the patent describes embodiments that use a graphical representation of each match in the form of a "'card' representing the suggested user." Ex. 2, '811 Patent, at 21:12-15. "A set of suggested users may be displayed as 'stack of cards.'" *Id.* at 21:15-16. This underscores the nontechnical and abstract nature of the claims.

The dependent claims are similarly abstract. *See id.* claims 2, 3, 5, 6, 8, 9; *see also Fairwarning*, 839 F.3d at 1096. Dependent claims 2, 5, and 8 are directed to the abstract idea of notifying a person of a match based on mutual attraction, which is something that human matchmakers have done for years. Dependent claims 3, 6, and 9 are directed to the abstract idea of providing potential matches within a set geographic distance from the user. *See* Ex. 2,

-14-

'811 Patent, claims 3, 6, 9.  These claims are abstract because a matchmaker could perform these steps by providing a client with matches located within a ten-mile radius of the client's home based on the client's recorded preferences.

Additionally, the asserted claims of the '811 Patent are directed to an abstract idea because they do not convey a specific technological improvement to computer functionality.  Indeed, the claims are not directed to technology at all.  Instead, they refer to a nontechnical method of matchmaking implemented on a generic computer.  *See, e.g.*, *id.* claim 1 ("a computer implemented method of profile matching"), 4 ("A non-transitory computer readable medium"), 7 ("a system for profile matching").  The claims focus on the abstract idea of matching individuals and allowing communication based on preference indications and not on improving the functionality of a computer.  Limiting the '811 Patent's alleged invention to a particular technological environment does "not make [its] abstract concept any less abstract under step one."  *Capital One*, 850 F.3d at 1340.

Thus, for these reasons, the Court should find that the claims of the '811 Patent are directed to the abstract idea of matchmaking and fail step one of the *Alice* test.

### 2.  The '811 Patent Lacks an Inventive Concept

*Second*, the asserted claims of the '811 Patent lack inventive concept.  Like the '854 Patent, the claims merely recite the performance of the abstract idea of using generic computer, smartphone, and internet features such as "a computer," "online-dating profiles," "a social networking platform," an "electronic device," "a graphical user interface," "swiping," "a non-transitory computer readable medium," "a processor," and "an interface."  Ex. 2, '811 Patent, claims 1, 4, 7.  As discussed above, these are nothing more than generic descriptions of computer components and functions that do not rise to the level of an inventive concept, either individually or as an ordered combination.  *See infra* § IV(A)(2).  Furthermore, the '811 Patent uses the same

-15-

generic terms, such as "social networking platform" and "graphical representation," which were construed in this Court's previous order (and the Court may decide to follow those constructions in this case), that prove the lack of technological innovation. *See id.*

As discussed above on the '854 Patent, "swiping," in the '811 Patent, does not provide an inventive concept either. *See supra* § IV(A)(2). As Match concedes and is evident from the face of the '811 Patent, swiping was a known method of interacting with a touchscreen. Dkt. 1 ¶ 97; Ex. 2, '811 Patent, at 19:35-38, 21:59-22:7, 22:37-39. Neither the claims nor the specification of the '811 Patent contains a technical description of "swiping" or how to implement "swiping"; therefore, it cannot serve as an inventive concept. *See Move*, 2018 WL 656377, at *5 ("zoom" feature found to be nothing more than an instruction to apply an abstract idea using a computer where neither the claims nor the specification provides any implementation details); *MySpace*, 672 F.3d at 1256; *Symantec*, 2018 WL 3537201, at *3; *see also Alice*, 573 U.S. at 221-24.

Further, removing the image of one potential match and replacing it with an image of a second potential match "automatically" fails to render the claim of the '811 Patent nonabstract. Dkt. 1 ¶ 62. Computer automation cannot render an abstract claim patent-eligible. *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017); *OIP Techs. v. Amazon.com Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015). The specifications do not use the term "automatically" or explain the "automatic" functionality. *See* Ex. 2, '811 Patent.

For the same reasons discussed above in the '854 Patent, the elements of the claims of the '811 Patent include no inventive concept that would render any of the claims patent-eligible.

## C.    The Court Should Dismiss the '023 Patent Because It Is Patent-Ineligible

### 1.    The '023 Patent Fails to Survive Step One of *Alice*

The claims of the '023 Patent are also directed to an abstract idea. Like the previous two patents discussed above, the '023 Patent relates to matchmaking, and it is specifically directed to

the abstract idea of looking through a stack of profile cards one at a time and showing interest in a match by moving a card to the right.  *See Elec. Power Grp. LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).  The '023 Patent claims a method of organizing human activity and is much like other abstract ideas found to be patent-ineligible.  *See supra* § IV(A)(1); *see also Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1384-86 (Fed. Cir. 2018) (voting, verifying the vote, and submitting the vote for tabulation); *Move, Inc. v. Real Est. All. Ltd.*, 2018 WL 656377, at *3-4 (Fed. Cir. Feb. 1, 2018) (collecting and organizing information about real-estate properties and displaying this information on a digital map).  The claims involve generic functions of automatically present/removing graphical images, detecting a gesture, and storing a preference indication.  *See generally* Ex. 3, '023 Patent, at 24:63-26:60.  "[N]ot only can these steps be 'carried out in existing computers long in use,' but they can also" be performed by a traditional matchmaker working with a client.  *See Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 (Fed. Cir. 2014).  For example, a human matchmaker could perform the steps of the claimed elements of claim 3 of the '023 Patent:

| Claim 3 | Matchmaker |
|---|---|
| A system, comprising: | A matchmaker. |
| an interface operable to:<br><br>present a graphical representation of a first item of information of a plurality of items of information, the first item of information comprising a graphical representation of a first online dating profile associated with a first user, wherein the interface is further operable to present the graphical representation of the first item of information of the plurality of items of information as a first card of a stack of cards; | The matchmaker presents a stack of profiles in the form of cards to a Client A containing pictures, information, and background of other clients.  The matchmaker presents the stack for Client A to review the first card only. |
| a processor coupled to the interface and operable to:<br><br>detect a gesture associated with the graphical | The matchmaker tells Client A to take the card that he is interested in and place it in a separate pile on the right, reflecting a gesture. |

| | |
|---|---|
| representation of the first item of information, the gesture corresponding to a positive preference indication associated with the first item of information, the positive preference indication associated with the first item of information comprising an expression of approval for the first user associated with the first online dating profile, wherein the processor is further operable to detect a right swiping direction associated with the gesture; | |
| store the positive preference indication associated with the first item of information in response to detecting the gesture; and | When Client A places the card in the pile on the right, the matchmaker notes in Client A's files that Client A is interested in that card. |
| the interface further operable to: <br><br> automatically present a graphical representation of a second item of information of the plurality of items of information in response to the processor detecting the gesture, the second item of information comprising a graphical representation of a second online dating profile associated with a second user; and | When Client A moves the first card to the right, Client A can review the second card in the original stack showing a new profile. |
| automatically remove the graphical representation of the first item of information in response to detecting the gesture. | When Client A removes the card to the pile on the right, it is no longer in the original stack of cards. |

The dependent claims are similarly abstract. Claims 2, 4, and 6 are directed to the abstract idea of claim 3 along with the abstract concept of preventing a user from viewing successive cards in a stack before preforming an action on the top card. Permitting someone to view only the top card in a deck is a commonly understood exercise. Further, humans physically can perform looking through the cards one at a time and picking cards based on preferences, as described above. Claims 2, 4, and 6 are limited to a narrow aspect of this abstract idea, which does not alter the patent-eligibility analysis or outcome. *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167-68 (Fed. Cir. 2018).

Moreover, the claims of the '023 Patent are directed to performing human activities on a computer, not a solution to a technological problem. *See In re TLI Commc'ns LLC Patent Litig.*,

823 F.3d 607, 612-13 (Fed. Cir. 2016).  Underscoring the nontechnical nature of the claims, the '023 Patent does "not claim a particular way of programming or designing the software" to perform the recited activities but rather claims, at a high level, the online-dating system itself.  *See Apple*, 842 F.3d at 1241.

## 2.  <u>The '023 Patent Lacks an Inventive Concept</u>

The claims of the '023 Patent do not provide an inventive concept.  Like the two patents above, the claims recite the performance of the abstract idea using generic computer, smartphone, and internet features such as an "online-dating profile," "a graphical user interface," "swiping," "a non-transitory computer readable medium," "a processor," and "a user interface."  Ex. 3, '023 Patent, claims 1, 3, 5.  As discussed with the '854 Patent, courts have repeatedly held that such generic components do not provide an inventive concept.  Similarly, the "presenting," "detecting," "storing," and "removing" recited in the claims are generic computer functions.  *See Planet Bingo*, 576 F. App'x at 1008.  A patent's recitation of a computer amounts to a mere instruction to implement an abstract idea on a computer; that addition cannot impart patent eligibility.  *Alice*, 573 U.S. at 223.

Displaying user profiles as a deck of cards cannot supply an inventive concept, because this itself is abstract.  *See BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018).  Humans have been using cards for hundreds, if not thousands, of years.  Merely displaying well-known, nontechnical objects on a generic computer is not inventive.  Indeed, using a deck of cards is decorative, supplying no inventive concept for the '023 Patent.  *See* 35 U.S.C. § 101 ("Whoever invents or discovers any new and useful process, machine, manufacture . . . may obtain a patent . . . .").

As discussed above with the '854 Patent, "swiping," in the '023 Patent, does not provide an inventive concept either.  *See supra* § IV(A)(2).  As Match concedes and is evident from the

face of the '023 Patent, swiping was a known method of interacting with a touchscreen.  Dkt. 1 ¶ 124; Ex. 3, '023 Patent, at 19:45-48, 22:4-22:19, 22:49-52.   Neither the claims nor the specification of the '023 Patent contains a technical description of "swiping" or how to implement "swiping"; therefore, it cannot serve as an inventive concept.  *See Move*, 2018 WL 656377, at *5 ("zoom" feature found to be nothing more than an instruction to apply an abstract idea using a computer where neither the claims nor the specification provides any implementation details); *MySpace*, 672 F.3d at 1256; *Symantec*, 2018 WL 3537201, at *3; *see also Alice*, 573 U.S. at 221-24. Further, as discussed with the '811 Patent, the removal of an image of one potential match and replacement of it with an image of a second potential match "automatically" fails to provide a basis to render the claim of the '811 Patent nonabstract.  *See supra* § IV(B)(2).

For the same reasons discussed above in the '854 Patent, the elements of the '023 Patent do not include an inventive concept and therefore do not survive step two of *Alice*.

## V.   CONCLUSION

For these reasons, Muzmatch requests that this Court grant its Motion and dismiss Match's patent-infringement claims as patent-ineligible under 35 U.S.C. § 101.

Dated:  April 8, 2021             Respectfully submitted,

**WINSTON & STRAWN LLP**

By:   */s/ Rex A. Mann*
       Thomas M. Melsheimer
       State Bar No. 13922550
       tmelsheimer@winston.com
       Rex A. Mann
       State Bar No. 24075509
       rmann@winston.com
       Ahtoosa A. Dale
       State Bar No. 24101443
       adale@winston.com
       2121 N. Pearl Street, Suite 900
       Dallas, TX 75201
       Telephone: (214) 453-6500
       Facsimile: (214) 453-6400

       Irina Lyapis *(Pro Hac Vice Forthcoming)*
       CA Bar No. 298723
       ILyapis@winston.com
       101 California Street
       San Francisco, CA 94111-5840
       Phone: (415) 591-1000
       Fax: (415) 591-1400

       Michael Tomasulo *(Pro Hac Vice Forthcoming)*
       CA Bar No. 179389
       MTomasulo@winston.com
       333 S. Grand Avenue
       Los Angeles, CA 90071-1543
       Phone: (213) 615-1700
       Fax: (213) 615-1750

       *Attorneys for Defendant*
       *Muzmatch Limited*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2021, a true and correct copy of the foregoing document was filed via ECF and served on all counsel of record registered to receive service through such means.

/s/ Rex A. Mann
Rex A. Mann