**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **MATCH GROUP, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No.  6:21-cv-00147-ADA** |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **MUZMATCH LIMITED** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF MATCH GROUP, LLC'S RESPONSE TO**
**DEFENDANT MUZMATCH LIMITED'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 1

II.     THE ASSERTED PATENTS RECITE PATENT-ELIGIBLE SUBJECT
        MATTER ................................................................................................................... 2

        A.      The Asserted Patents Embody Match's Innovations. ........................................... 3

        B.      The Court Applies the Two-Step *Alice* Process to Evaluate Subject-Matter
                Eligibility on a Motion to Dismiss. ................................................................... 5

        C.      The '854 Patent's Claims Are Subject-Matter Eligible. ...................................... 6

                1.      The '854 Patent's Claims Are Directed to an Improved
                        Matchmaking User Interface, Not an Abstract Idea. ................................ 6

                2.      Muzmatch Fails to Establish the Lack of an Inventive Concept. ............ 13

        D.      The '811 Patent's Claims Are Subject Matter Eligible. ...................................... 16

                1.      The '811 Patent's Claims Are Directed to an Improved
                        Matchmaking User Interface, Not an Abstract Idea. ............................... 16

                2.      Muzmatch Fails to Establish the Lack of an Inventive Concept. ............ 17

        E.      The '023 Patent's Claims Are Subject Matter Eligible. ...................................... 18

                1.      The '023 Patent's Claims Are Directed to an Improved
                        Matchmaking User Interface, Not an Abstract Idea. ............................... 18

                2.      Muzmatch Fails to Establish the Lack of an Inventive Concept. ............ 19

        F.      Claim Constructions from *Bumble* Do Not Change the Analysis........................ 20

        G.      The Asserted Patents Do Not Present Any Significant Preemption
                Concerns. ....................................................................................................... 20

III.    CONCLUSION......................................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018).................................................................5, 14, 20

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   890 F.3d 1354 (Fed. Cir. 2018) ...................................................................14, 15

*Alice Corp. Pty. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014)....................................................................................2, 4, 5

*Apple, Inc. v. Ameranth, Inc.*,
   842 F.3d 1229 (Fed. Cir. 2016)................................................................................19

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016)................................................................................15

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)....................................................................5, 10, 15

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   880 F.3d 1356 (Fed. Cir. 2018)..........................................1, 6, 7, 8, 9, 10, 11, 18

*Data Engine Techs. LLC v. Google LLC*,
   906 F.3d 999 (Fed. Cir. 2018)........................................1, 2, 5, 6, 8, 10, 13, 18

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016)....................................................................5, 6, 12

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   879 F.3d 1299 (Fed. Cir. 2018)................................................................................19

*Match Grp., LLC v. Bumble Trading Inc.*,
   No. 6:18-CV-00080-ADA, (W.D. Tex.)....................................1, 5, 8, 9, 16, 18, 20

*Mayo Collab. Servs. v. Prometheus Labs., Inc.*,
   566 U.S. 66 (2012).........................................................................................................6

*McRO, Inc. v. Bandai Namco Games Am., Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016)..........................................................................11, 12

*Move, Inc. v. Real Est. All. Ltd.*,
   721 F. App'x 950 (Fed. Cir. 2018) ................................................................2, 17

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)................................................................................13

*Trading Techs. Int'l, Inc. v. CQG, Inc.*,
    675 F. App'x 1001 (Fed. Cir. 2017) ....................................................7, 8, 11, 13

*X2Y Attenuators, LLC v. Int'l Trade Comm'n*,
    757 F.3d 1358 (Fed. Cir. 2014)................................................................................3

## I.    __INTRODUCTION__

This Court has already determined:

> [T]he claims here are directed to a new user interface . . . for a dating application. . . .  These innovations improve existing interface technology. This improvement has been a commercial success because it has increased 'the speed of a user's navigation through [potential matches],' which is apparently important to a substantial number of people who are interested in meeting other people via the internet.

*Match Grp., LLC v. Bumble Trading Inc.*, No. 6:18-CV-00080-ADA, 2018 U.S. Dist. LEXIS 235353, at *18 (W.D. Tex. Dec. 18, 2018) ("*Bumble* Order") (quoting *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1363 (Fed. Cir. 2018) (modification in original)).[1] Although this Court previously denied a motion almost identical to Muzmatch's motion, Muzmatch *makes no attempt* to distinguish its motion or justify a different result.  Muzmatch does not even mention the *Bumble* Order, while simply recycling Bumble's Motion (verbatim in several instances).  It also fails to mention—let alone distinguish—three cases the Court found persuasive in determining that the '023 and '811 Patents' claims are patent-eligible.  *See Bumble* Order, at *16 ("[T]he Court finds the decisions in *Core Wireless*, *Trading Technologies*, and *Data Engine* to be persuasive.  The claims here are directed to a new user interface—in this case, for a dating application.").  In short, Muzmatch fails to provide any new argument or explain why the Court should change its prior decision.

As the Court already determined, the '023 and '811 Patents' claims (*see* Exs. A, B) are directed to an improved user interface, not an abstract idea.  Similarly, the '854 Patent's claims (*see* Ex. C) are not abstract.  Therefore, the Court should deny Muzmatch's motion.

---

[1] In the *Bumble* litigation, the Court only considered the claims of U.S. Patent No. 9,959,023 (the "'023 Patent") and 9,733,811 (the "'811 Patent).  However, the subject matter of U.S. Patent No. 10,203,854 (the "'854 Patent") is similar enough to be eligible for many of the same reasons.

## II.     THE ASSERTED PATENTS RECITE PATENT-ELIGIBLE SUBJECT MATTER

The Court is familiar with the Asserted Patents' subject matter—it previously ruled the '023 and '811 Patents' claims are patent eligible.  And unlike the many "aspirational" software-based patents courts have invalidated in the wake of the Supreme Court's *Alice* decision, *see Move, Inc. v. Real Est. All. Ltd.*, 721 F. App'x 950, 954 (Fed. Cir. 2018), the asserted claims recite a specific physical and visual interface protocol that improves user experience in matchmaking apps, facilitates faster decision-making, and thereby drives user engagement.  *See Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008 (Fed. Cir. 2018) (holding claims reciting "highly intuitive, user-friendly interface with familiar notebook tabs" non-abstract).

Indeed, far from seeking an aspirational patent, the inventors built the Tinder app from their own innovations, and it now has over 66 million average monthly active users.[2]  It is no coincidence that after pioneering this market, Tinder continues to dominate it and faces copying from competitors like Muzmatch.  This would not occur if—as Muzmatch contends—the innovations embodied in the Tinder app was merely "conventional matchmaking on a computer."

And while Muzmatch now claims Match's patented inventions are merely abstract ideas combining conventional elements, it identifies no service—including its own—with those elements before the Tinder app's release.  Moreover, the market associates the patented features so strongly with Tinder that prior to Match's suit, Muzmatch billed itself as the "Muslim Tinder" as a shorthand to tell consumers it uses Tinder's inventions.[3]  Just as the Court has, Muzmatch and the market have recognized, and praised, Tinder's innovative and groundbreaking features.

---

[2] *See* Reuters, *Match tops sales estimates as Tinder, Hinge keep sparks flying* (Feb. 2, 2021), https://www.reuters.com/article/us-match-group-results-idUSKBN2A22V1.

[3] *See* WFTV, *Muslim Tinder sued by Match Group for patent-infringement* (Feb. 18, 2021), https://worldfuturetv.com/2021/02/18/muslim-tinder-sued-by-match-group-for-patent-infringement/.

A.      **The Asserted Patents Embody Match's Innovations.**

Match affiliates, including Match.com, pioneered online dating beginning in 1994.  In 2007, well before Tinder was conceived, three Match.com employees came up with new ideas related to matchmaking services.  In December 2007, Match.com filed a provisional application (the "Match.com Application") on the new ideas, disclosing two primary innovations: (1) importing information from social networks into the system, e.g., to increase the ease of signing up for service; and (2) calculating a "score" for users based on various considerations and improving search results by taking those scores into account.  *See* Ex. D at 32:23-25; 39:30-40:4. It also described improvements such as receiving "positive" and "negative" preferences concerning users and considering such "preferences" when showing search results.  *See id*. at 36:10-25 (considering if "Match result entity has expressed a preference for the user"); *id*. at 37:13-18 (removing entities for which user has expressed negatives preferences).  The Match.com Application ultimately became U.S. Patent No. 8,566,327.  *See* Ex. E, '327 Patent.

In 2012, Tinder was born out of a Match-affiliated incubator.  With its double-blind mutual-opt-in system, performed on a specific, draggable-card-based user interface, the Tinder app changed the online-dating world, and has been described as "famous" and "iconic."  Complaint at ¶¶ 26, 28, 29.  After the Tinder app's release, Match protected these groundbreaking innovations.

Because (1) the Tinder app used innovations from the Match.com Application, and (2) Match.com and Tinder were affiliates, Match prosecuted the Tinder innovations as a continuation-in-part ("CIP") of the Match.com Application.  While the CIP's claims include innovations from the Match.com Application, they are directed to new material.[4]  *See X2Y*

---

[4] During prosecution, one of the inventors swore behind 2012 prior art.  This highlights that the Asserted Patents' claims are directed to innovations disclosed in the new material.  Ex. F at 93-97.

*Attenuators, LLC v. Int'l Trade Comm'n*, 757 F.3d 1358, 1366 (Fed. Cir. 2014) ("[S]ome subject matter of a CIP application is necessarily different . . . ."). The CIP focuses on improving prior-art matchmaking systems in at least two relevant ways: (1) not allowing communication unless both sides indicate a positive preference; and (2) using a card-based interface characterized in part by a specific gesture, denominated as a "swipe."[5] *See, e.g.*, '811 Patent at 22:57-60; 21:54-22:1; Figs. 8, 9. Examples are shown in Figs. 8 and 10:



The Asserted Patents' claims all require the dragging gesture's use. The '811 Patent's claims also require preventing communication between users unless both express positive preferences. And the '854 Patent's claims require operation "without allowing communication" unless users mutually expressed positive preferences.

The '811, '023, and '854 Patents issued on August 15, 2017; May 1, 2018; and February 12, 2019, respectively. In each case, the Patent Office was guided by *Alice* and a significant body of Federal Circuit case law interpreting that decision. The '023 and '854 Patents also overcame subject-matter-eligibility rejections. *See* Ex. G at 87-94 (rejecting prior versions of claims under

---

[5] Because Tinder pioneered use of this gesture in connection with dating applications, its name for the gesture also became uniquely associated with Tinder; it is now a registered trademark in the dating-app context. To avoid confusion between use of the SWIPE trademark and the gesture claimed in the patents, when not quoting from the patents, this brief refers to the gesture by the generic "dragging gesture."

§ 101); *see* Ex. H at 77-85 (same).  And of course, the '811 Patent and the '023 Patent already survive a motion to dismiss.[6]

> **B.  The Court Applies the Two-Step *Alice* Process to Evaluate Subject-Matter Eligibility on a Motion to Dismiss.**

The first step in evaluating subject-matter eligibility is determining whether claims are directed to a patent-ineligible concept like an abstract idea.  *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).  If the claims are not directed to an ineligible concept, the inquiry ends—the claims are eligible.  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016).  If the claims are "directed to" an ineligible concept like an abstract idea, the Court then considers whether the claim's limitations—alone or as an ordered combination—contain an "inventive concept" applied to the identified idea to which the claims are directed—i.e., whether the claims contain "something more" than what was routine or conventional in the industry at the time of the invention.  *Alice*, 134 S. Ct. at 2355.

Factual determinations are called for in both steps.  *See Data Engine*, 906 F.3d at 1008 (relying on newspaper articles at step 1); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) ("*Aatrix Software I*") (describing procedure for evaluating pleadings at step 2).  It is the defendant's burden to establish all pertinent facts by clear and convincing evidence.  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).  And it may rely only on the complaint and evidence capable of judicial notice.  *Aatrix Software I*, 882 F.3d at 1128.

---

[6]  *See Bumble* Order.

### C.      The '854 Patent's Claims Are Subject-Matter Eligible.

While Bumble's motion was limited to the '023 and '811 Patents, and Muzmatch's motion includes the '854 Patent, it merely recycles Bumble's arguments for each Asserted Patent. Accordingly, the analysis applied to the '023 and '811 Patents also applies to the '854 Patent.

### 1.      The '854 Patent's Claims Are Directed to an Improved Matchmaking User Interface, Not an Abstract Idea.

Determining whether a claim is directed to an abstract idea is a "meaningful" step.  *Enfish*, 822 F.3d at 1335.  It is not sufficient that claims "involve" an abstract idea because "all inventions at some level embody, use, reflect, rest upon, or apply . . . abstract ideas."  *Id*. (quoting *Mayo Collab. Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012)).   A claim directed to a computer-device improvement is patent eligible.  *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1362 (Fed. Cir. 2018).  To make this determination, courts typically look to the claims and intrinsic evidence, including prosecution history.  *See, e.g.*, *id*. at 1362-63; *Data Engine*, 906 F.3d at 1008 n.2.

The '854 Patent's claims recite "an interface" that presents a "graphical representation of a [] potential match," with a processor to detect a "gesture," where the gesture is associated with a "positive preference indication."  *See, e.g.*, Claim 4.  In response to detecting the gesture, the interface both presents a second graphical representation of a profile and removes the first.  *Id*. The claims further recite "allowing communication" only between two users who mutually expressed a preference for one another and "without allowing communication" if not.  *Id*.

Thus, the '854 Patent's claims are directed to a non-abstract improvement in user-interface technology for particular use in a matchmaking app and provide an easy-to-navigate system that allows and encourages users to make more efficient binary preference choices in using computer-based dating systems.  Complaint at ¶¶ 152-156; 96-100; 121-125.  By use of this

specific physical and visual interface protocol, it also requires users to make choices before moving on, rather than deferring their choices—a protocol that promotes speed of decision-making and drives user engagement by facilitating more matches.  This is not abstract.  *See Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F. App'x 1001, 1005 (Fed. Cir. 2017) ("Abstraction is avoided or overcome when a proposed new application or computer-implemented function is not simply the generalized use of a computer as a tool to conduct a known or obvious process, but instead is an improvement to the capability of the system as a whole.").

The Federal Circuit has repeatedly confirmed that concrete improvements to user interfaces are patent-eligible.  For example, in *Core Wireless*—absent from Muzmatch's motion despite the Court's prior reliance on same—the Federal Circuit addressed a claim related to a menu display. 880 F.3d 1356.  The menu included an "application summary" that could be reached "directly from the menu" containing data from one or more applications.  *Id*. at 1359.  The application summary could then be used to launch the application and "enable the selected data to be seen."  *Id*.

The inventors of the *Core Wireless* patent did not invent menus, summaries, applications, launching applications, data, or summarizing data.  But the Federal Circuit concluded that the claims were eligible at step one because the combination of elements claimed "an improved user interface for electronic devices, particularly those with small screens."  *Id*. at 1362.  While the claims could be easily characterized as directed to the concept of an "application data summary menu" reachable from a main menu, this was not an ineligible idea because it was not abstract. Instead, it solved interface-based problems.  Prior interfaces could "seem slow, complex and difficult to learn," as users had to "drill down through many layers to get to desired data" and were required to "scroll around and switch views" to find what they needed.  *Id*. at 1363.  The claimed

menu, in contrast, improved "the speed of a user's navigation through various views and windows" by disclosing a "specific manner of displaying a limited set of information to the user." *Id.*

The Federal Circuit found another user-interface claim eligible at step 1 in *Trading Technologies*, 675 F. App'x 1001. The claims recited "a method for displaying market information" related to commodity trading. Specifically, the claims recited an interface that displayed dynamic quantity bid and ask information alongside static pricing information so traders could better trade commodities more quickly, while ensuring that their trades were made at their preferred price. *Id.* at 1003. Again, the inventors did not invent static pricing, dynamic quantities, bid prices, or ask prices. But the interface was a claimed improvement over prior art, where price could change based on market conditions while the trade was being executed. *Id.* at 1006.

The Federal Circuit reiterated these principles in *Data Engine*, 906 F.3d 999, concluding that an improvement in spreadsheet interfaces was subject matter eligible. The inventions recited the addition of "notebook tabs" to existing three-dimensional spreadsheet interfaces to navigate between pages. *Id.* at 1004-05. Despite the fact that three-dimensional spreadsheets existed and "humans [had] long used tabs to organize information," (*id.* at 1011), the Federal Circuit held that the representative claim recited a patentable improvement to user interface technology. Specifically, it solved problems in existing interface technology by providing a "highly intuitive, user-friendly interface with familiar notebook tabs for navigating the three-dimensional work-sheet environment" (*id.* at 1008), and was therefore patent eligible. In fact, the notebook tab improvement solved computer-based problems specifically because "it include[d] user-familiar objects, i.e., paradigms of real-world objects which the user already knows." *Id.* at 1003.

The Court already recognized in *Match v. Bumble* that the '023 and '811 Patents' claims are indistinguishable from those in *Core Wireless*, *Trading Technologies*, and *Data Engine*. *See*

*Bumble* Order, at *17-19.  And like the '023 and '811 Patents, the '854 Patent claims a system employing an interface with graphical representations of online dating profiles.[7]  *See, e.g.*, claim 7 (reciting a "computer implemented method of profile matching" that causes the display of matches in a particular way); claim 4 (reciting "a system for profile matching," comprising "an interface" presenting graphics in a particular way).  It claims indicating preferences by use of a "swiping gesture" and removing one profile and showing another profile after receiving a gesture. *See, e.g.*, claim 4 ("[C]ause the graphical user interface to display a graphical representation of a second potential match. . . .").  It thus recites non-abstract subject matter in the same manner as the '023 and '811 Patents.  The '854 Patent claims narrower functionality and is more specific about the flow of the improved interface and system than the '023 Patent.  For example, the '854 Patent claims that a removed profile will reappear in response to a determination to "allow [] communicat[ion]"—which occurs only after both users corresponding to the profiles have expressed a positive preference.  *See* claim 4.  This is a specific arrangement of screens and information, engaged with in a particular way, to make a better computer-based matchmaking system—a system that has been immensely successful.

Rather than a user viewing potential matches by scrolling through a list, the claimed interface provides a different improved interface.  Expressing preferences by a "swiping gesture"—combined with removing a graphical representation of a match and displaying another match in response to detecting the gesture—improves existing interface technology to increase "the speed of a user's navigation through [potential matches]."  *Core Wireless*, 880 F.3d 1363; Complaint at ¶¶ 153-156; 122-125; 97-100.  As in *Core Wireless*, these advantages over prior user

---

[7] Unlike the '023 Patent, the '811 and '854 Patents' claims do not require the graphical representations to be "cards."  The claims also do not require the "swiping gesture" be in the "right-swiping direction."  Instead, the claims recite that "swiping gesture[s]" corresponding to positive and negative preferences must be different from one another.  The claims are broader in this respect but narrower in others.

interfaces are particularly advantageous in small-screen or mobile devices, where scroll-based interfaces can be difficult to navigate.   Moreover, like *Data Engine*, the claims' graphical representation of a match and acting on the graphical representation in a particular way facilitates ease of use by "including user-familiar objects . . . which the user already knows how to use." *Data Engine*, 906 F.3d at 1003.[8]   These claims recite eligible inventions.

Muzmatch contends that the claims merely relate to the idea of "connecting people with potential matches based on their mutual attraction to each other, or not connecting them because of the lack of mutual attraction."  Dkt. No. 11 at 5.  But Muzmatch's arguments are flawed because the "directed to" inquiry is more than simply finding a catch-phrase with which to describe concepts in the claims.  To show ineligibility, "[i]t is not enough . . . to merely trace the invention to some real-world analogy."  *Data Engine*, 906 F.3d at 1011.  Yet that is all Muzmatch attempts. It makes no sense to say the claims are directed to only connecting people based on mutual attraction when that idea has no independent utility outside of the technological field.  The claims are eligible because they apply the general concept of connecting people based on mutual attraction—with specific additional limitations omitted by Muzmatch's hypothetical idea—in a particular way.  *See id*. at 1003 (application of notebook tabs concept to spreadsheets non-abstract).

Muzmatch's formulation of the alleged idea also fails to capture critical claim limitations and ignores the inventive concept itself.  For one, the claims do not recite "connecting people with potential matches based on their mutual attraction to each other," but rather a specific arrangement of screens and information, engaged with in a particular way.  The claims recite a "gesture" that causes specific changes in graphical representations of profiles and prevents or allows

---

[8] There is also no legitimate dispute that these improvements are recited in the claims.  *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1370 (Fed. Cir. 2018) (distinguishing between benefits achieved by limitations in the claims and benefits merely described in the specification).

communication with represented users.  The specification describes the relevant gesture as a "touch input" performed "by moving a finger or other suitable object across the screen."  '854 Patent at 19:35-3; 19:35-39; 21:66-22:3.  This physical interaction is narrower than a matchmaker going through a stack of cards with a client, is native to the claims' technology, and—in the context of the claimed system—facilitates more efficient decision-making.  The claims further require displaying a second profile graphic and removing the first in response to the gesture.  Again, this is narrower than simply looking at physical cards one at a time because the claimed interface requires a preference indication on each profile, limiting the ability to reconsider preferences, and accelerating movement to new profiles.  This improved interface drives user engagement and facilitates more matches by allowing quick preference indications and precluding deferred indications, and therefore, it is not abstract.

Muzmatch incorrectly assumes that anything that could be performed by a human is abstract.  But the Federal Circuit has rejected this contention:  "[P]rocesses that automate tasks that humans are capable of performing are patent eligible if properly claimed."  *McRO, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016).  A librarian could show a patron a summary of data from other sources and then, upon request, take the patron to the sources themselves.  *Cf. Core Wireless*, 880 F.3d at 1362-63.  A commodities broker could, with a pencil and paper, calculate bid prices, ask prices, and various quantities and display them in a manner in which the broker changed the quantities but did not change the prices.  *Cf. Trading Techs.*, 675 F. App'x at 1003.  An animator could use rules rather than subjective considerations to lip sync animations.  *Cf. McRO, Inc.*, 837 F.3d at 1313.  And a matchmaker could give a client a stack of cards with potential matches, require the client to move his finger across the cards one at a time, and immediately remove a card after it had been dragged to the right.  But why?  There is no

evidence that this has been done—and doing so would serve no purpose.  *See McRO*, 837 F.3d at 1314 ("Defendants provided no evidence that the process previously used by animators is the same as the process required by the claims.").   Meanwhile, in a computer-based matchmaking environment, the claimed invention has specific tangible benefits.

Muzmatch also contends the claims must be directed to an abstraction rather than improved interface technology because the specification does not expressly describe a technical problem to which it proposes a solution.  *See* Dkt. No. 11 at 8-12.  This is a red herring.  While express recitations of computer-specific benefits in the specification exist in some eligibility cases, they are not required.  And the intrinsic record of the '854 Patent is just as compelling as an express acknowledgement that the claims are directed to the above-mentioned benefits.

As discussed, Match.com filed the Match.com Application, which discloses a particular matchmaking system.  Those inventions and their eligibility are not at issue.  In 2012, the Tinder inventors created the groundbreaking Tinder app and filed an application for its underlying innovations.  They added new material improving upon the preexisting Match.com system—by improving the interface with specific interactions with graphical representations of potential matches, which is recited in the '854 Patent's claims.  These improvements are not routine or conventional limitations "added post-hoc to a fundamental practice."  *Enfish*, 822 F.3d at 1340. They were specific improvements built into and embodied by an extremely successful commercial application.  Further, the additions are significant distinctions over the prior art.  Indeed, after rejecting the '854 Patent's claims for subject matter eligibility reasons, the Examiner expressly concluded that the closest prior art failed to teach, *inter alia*, "the first user indicates a first positive preference associated with the graphical representation of the second user on the graphic user interface . . . wherein the first gesture comprises a first swiping gesture; allow the first user to

communicate with the second user in response to . . . the first positive preference indication regarding the second user and a second user expressing a positive preference regarding the first user . . ." Ex. H at 13-14.; *see also Data Engine*, 906 F.3d at 1007-08 (comparing claims to prior art). The specification need not discuss every benefit flowing from this new matter because its purpose is to "teach and enable those of skill in the art to make and use the invention" (*Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005). And the prosecution history confirms the '854 Patent is directed to that new interface and related interaction, not an abstraction related to a matchmaking system. *See* Ex. H at 77-85.

Finally, Muzmatch complains that the '854 Patent fails to "convey a specific technological improvement of computer functionality." Dkt. No. 11 at 9. However, the claims do not simply recite "matchmaking," but provide an improved interface and user experience.[9] For example, they recite a tangible improvement over search and scroll-based matchmaking interfaces similar to the one disclosed in the Match.com App. *See, e.g.*, Ex. D at Figs. 1E, 1F. The claims recite concrete improvements to graphical user interfaces in dating applications and are not abstract.[10]

### 2. Muzmatch Fails to Establish the Lack of an Inventive Concept.

Even inventions "directed to" abstract ideas are patent eligible if they contain limitations that "involve more than the performance of well-understood, routine, and conventional activities previously known to the industry." *Aatrix I*, 882 F.3d at 1128 (quotations and citations omitted).

---

[9] To argue that any patent related to matchmaking is necessarily invalid, Muzmatch makes a passing reference to a few cases related to the alleged abstractness of "matchmaking." *See* Dkt. No. 11 at 5-6. None of these cases address interface improvements, but instead address claims that recite an exchange of information and a generic analysis of that information on a computer.

[10] The '854 Patent also describes another specific technological improvement to a known system: a way of avoiding unwanted communications. In prior systems, users could have a "large number of unwanted communication requests [that] can become a nuisance to the user." '854 Patent at 1:66-67. This problem is solved by allowing "initial communication" only between two users who mutually expressed a preference for one another and "prevent[ing] communication" if not. This allows users to "avoid browsing, deleting, or responding to unwanted messages." *Id.* at 23:7-9; *see Trading Techs.* 675 F. App'x at 1005.

Unless contradicted by the patent specification itself, the Court must accept any factual allegations about the nonconventionality of a limitation or combination of limitations as true. *Aatrix I*, 882 F.3d at 1125; *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1356 (Fed. Cir. 2018) ("*Aatrix II*") (Moore, J., concurring in denial of petition for rehearing en banc, joined by Dyk., J., O'Malley, J., Taranto, J., and Stoll, J.) (reasoning that a pleading-based dismissal is appropriate only where specification admits an inventive concept was conventional).

As discussed, the asserted claims include limitations beyond Muzmatch's posited idea. The graphical representation of a potential match must be removed and replaced with another graphical representation in light of a preference indication, not simply a matchmaker setting a card to the side. The preference must be one detected by a "swiping gesture"—which the specification makes clear is uniquely associated with touch screens—not simply a move to the right. This combination of limitations improves on existing dating interface technology by allowing and encouraging "users to sift through more information, more quickly than previous interfaces addressing similar binary choice decisions" and thereby "revolutionized the world of online dating." Complaint at ¶¶ 98; 125; 156. The claims limit second-guessing and foster quick decision-making, which drives user engagement and improves the system. According to the Complaint, these improvements were non-conventional and non-routine at the time of the invention, *id*. at ¶¶ 153-156; 122-125; 97-100—as Tinder's (and Muzmatch's) subsequent astonishing success confirms. If the Court even proceeds to step 2 (which it should not), these factual allegations end the Court's inquiry.

Muzmatch asks the Court to ignore established precedent in favor of its own proposed standard. Specifically, Muzmatch advocates for a retroactive requirement that, unless a computer-related invention expressly describes the problems, solutions, and computer-based

benefits in its specification, it must be dismissed on the pleadings—regardless of whether those problems, solutions, and computer-based benefits exist.  *See* Dkt. No. 11 at 11-12.  No such requirement exists.  But on a motion to dismiss, the Court is required to take all facts pleaded as true and make reasonable inferences in Match's favor.  It is Muzmatch's burden here to contradict as a matter of law the pleaded facts.  This can occur only where the specification admits that an alleged combination is merely routine.  *See Aatrix II*, 890 F.3d at 1356.  Where, as here, the specification is silent about the limitations' inventiveness, the Court must credit the Complaint's well-pleaded facts.  *Id*.  The '854 Patent does not indicate that an interface in which a user expresses preferences via a dragging gesture on a card that is removed and replaced after the gesture is detected was routine or conventional matchmaking interface technology.

Muzmatch also contends that the claims cannot contain an inventive concept because the dragging gesture was "known" in the prior art.  Dkt. No. 11 at 11-12.  This fails on two accounts.  First, "[t]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art."  *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).  Second, it is not enough to point out that some particular gesture may have existed on some screen in some piece of prior art.  *See Berkheimer*, 881 F.3d at 1369 ("Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art.").  Regardless of whether software detected similar gestures on touch screens, Muzmatch offers no evidence whatsoever that the ordered combination of limitations that distinguishes the claimed invention existed in the prior art at all, much less that it is used in a routine and conventional manner.  Nor could it.  The claims involve more than a dragging gesture and moving cards to express preferences; they recite specific physical and visual

interactions with a matchmaking user interface.  Even if directed to Muzmatch's posited "idea," the claims still improve interface technology for the previously discussed reasons.

**D.      The '811 Patent's Claims Are Subject Matter Eligible.**

As mentioned, the Court already determined that the '811 Patent's claims are directed to patent eligible subject matter:

> The '811 Patent is eligible for many of the same reasons as the '023 Patent. . . .  [I]t describes a system employing an interface with graphical representations of online dating profiles.  It describes indicating preferences by use of a "swiping gesture," and . . . removing one profile and showing another profile after receiving such a gesture . . .  The Court agrees that the '811 Patent describes narrower functionality and more specifics about the flow of the improved interface and system.

*Bumble* Order, at *18-19.  While the Court could now conclude otherwise, Muzmatch does not make any new argument.

1.      <u>The '811 Patent's Claims Are Directed to an Improved Matchmaking User Interface, Not an Abstract Idea</u>.

The '811 Patent is eligible for many of the same reasons as the '854 Patent.  Like the '854 Patent, it describes a system employing an interface with graphical representations of online dating profiles.  It claims indicating preferences using a dragging gesture and removing one profile and showing another profile after receiving a gesture.  *See, e.g.*, claim 7 ("[A]utomatically cause the interface to remove the presentation of the first potential match . . . and cause the interface to present . . . a second potential match . . . .").  It thus recites non-abstract subject matter in the same manner as the '854 Patent.  Like the '854 Patent, the '811 Patent describes narrower functionality and more specifics about the flow of the improved interface and system.  For example, the '811 Patent recites that a removed profile will reappear in response to a determination to "enable communication"—which occurs only after both users corresponding to the profiles have expressed a positive preference.  *See* claim 7.  This is a specific arrangement of screens and information,

engaged with in a particular way, to make a better computer-based matchmaking system—a system that has been immensely successful.

Like its allegations regarding the '854 Patent, Muzmatch contends that the claims of the '811 Patent are related to the idea of "connecting people with potential matches based on their mutual attraction to each other, or not connecting them because of the lack of mutual attraction." Dkt. No. 11 at 5, 12.  Again, although the claims may involve that idea at a general level, they are not directed to it.  Muzmatch's highly generalized proposed idea was discussed and disclosed in the Match.com Application.  *See* Ex. D at 36:10-25.  Given the claims here include the CIP material, they are necessarily directed to something more or different than this highly generalized mischaracterization.  For the same reasons that the '023 and '854 Patents are directed to an improved draggable one-at-a-time matchmaking interface that enables and encourages users to make binary choices more quickly, the '811 Patent recites an improved matchmaking system, implemented via an improved matchmaking interface.[11]

### 2.   Muzmatch Fails to Establish the Lack of an Inventive Concept.

If the Court accepts Muzmatch's arguments about what the '811 Patent's claims are directed to, there is still an inventive concept in the claims.  The limitations concerning the draggable interface also exist in the '811 Patent's claims, including where profiles are removed and replaced once a gesture is performed.  And Match's Complaint alleges that these limitations provide computer-based improvements.   Complaint at ¶¶ 152-156; 96-100; 121-125.   The

---

[11] The Federal Circuit's decision in *Move, Inc. v. Real Estate Alliance Ltd.*, 721 F. App'x 950 (Fed. Cir. 2018) does not support Muzmatch's analysis.  *See* Dkt. No. 11 at 16.  The patentee alleged that a "zoom feature" was an inventive concept in claims directed to the idea of collecting and organizing information about available real estate properties and displaying the information on a map.  *Id*. at 957.  But the zoom feature was merely an aspirational result; nothing about the feature was described, and the notion of getting closer to or further away from something is anything but computer-specific.  The claims here are not of the aspirational, results-based type.

specification does not suggest the improvements are conventional—and they were not.  At most, the specification highlights the interface is a computer interface, which does not prove ineligibility.

###### E.      The '023 Patent's Claims Are Subject Matter Eligible.

Like the '811 Patent, the Court also determined that the '023 Patent's claims are directed to patent eligible subject matter:

> The Court agrees . . . that the claims of the '023 Patent are indistinguishable from the claims in *Core Wireless*, *Trading Technologies*, and *Data Engine*.  Like those eligible patent claims, the claims here are directed to a new user interface . . . for a dating application.  The application is characterized by a "stack of cards," that are "graphical representations of [] online dating profile[s]," and user preferences regarding those cards are detected by virtue of a "gesture," where the "positive preference" gesture is determined by "detecting a right swiping direction."  When a user performs the gesture, the interface is modified to both show a new item of information and to automatically remove the first card.  These innovations improve existing interface technology.  This improvement has been a commercial success because it has increased "the speed of a user's navigation through [potential matches]," which is apparently important to a substantial number of people who are interested in meeting other people via the internet.

*Bumble* Order, at *17-18 (internal citations omitted).  Again, while the Court could now reach a different conclusion, Muzmatch has not made any new argument.

> 1.      <u>The '023 Patent's Claims Are Directed to an Improved Matchmaking User Interface, Not an Abstract Idea.</u>

The '023 Patent is eligible for many of the same reasons as the '854 and '811 Patents.  Like the '854 and '811 Patents, it describes a system employing an interface with graphical representations of online dating profiles.  And as the Court recognized in *Match v. Bumble*, the '023 Patent's claims are indistinguishable from those in *Core Wireless*, *Trading Technologies*, and *Data Engine*.  For example, claim 1 recites a "method of navigating a user interface" and the application is characterized by a "stack of cards," that are "graphical representations of [] online dating profile[s]," and user preferences regarding those cards are detected by virtue of a "gesture," where the "positive preference" gesture is determined by "detecting a right swiping direction."

When a user performs the gesture, the interface is modified to both show a new item of information and to automatically remove the first.  This invention improved existing interface technology.  Muzmatch fails to establish otherwise and merely contends the claims are directed to "looking through a stack of profile cards one at a time and showing interest in a match by moving a card to the right."  Dkt. No. 11 at 16-17.  As explained with respect to the '811 and '854 Patents, this is wrong.

Further, Muzmatch complains that the '023 Patent fails to "'claim a particular way of programming or designing the software' to perform the recited activities but rather claims, at a high level, the online-dating system itself."  Dkt. No. 11 at 19 (quoting *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016)).  This is meritless at least because the claims do not simply describe a result.  *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018) (describing *Ameranth* decision as meaning only that "a result, even an innovative result, is not itself patentable").  The claims provide a way of reaching the desired result with an improved interface and user experience.  As just one example, they recite a tangible improvement over search and scroll-based matchmaking interfaces similar to the one disclosed in the Match.com Application  *See, e.g.*, Ex. D at Figs. 1E, 1F.  The '023 Patent's claims recite concrete improvements to existing graphical user interfaces in dating applications.  They are non-abstract and thus are patent eligible.

### 2.     Muzmatch Fails to Establish the Lack of an Inventive Concept.

Even if the Court finds the claims are directed only to the idea of "looking through a stack of profile cards one at a time and showing interest . . . by moving a card to the right," and that this idea is abstract, it should still deny Muzmatch's motion.  Even inventions "directed to" abstract ideas are patent eligible if they contain limitations that "involve more than the performance of well-understood, routine, and conventional activities previously known to the industry."  *Aatrix I*,

882 F.3d at 1128 (quotations and citations omitted).  As discussed, the claims include limitations beyond Muzmatch's posited idea.  The card must be "automatically removed," not simply set to the side.  The preference must be detected by a "gesture" in the "right swiping direction"—which the specification makes clear is associated with touch screens—not simply a move to the right. Therefore, the claims improve existing interface technology.

### F.     Claim Constructions from *Bumble* Do Not Change the Analysis.

Muzmatch argues "this Court held that several of these terms should be given their plain and ordinary meaning, proving the non-inventive generic components within these claims," and that "such language underscores the lack of technological invention within the patent's claims." Dkt. No. 11 at 11.  But construing a claim term as its plain and ordinary meaning does not somehow render the claim generic or show that it lacks any technological invention.  To the contrary, the Court stated that "[g]iving a term its plain and ordinary meaning does not leave the term devoid of any meaning whatsoever.  Instead, 'the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent.'"  *Match Group, LLC v. Bumble Trading, Inc.*, 6:18-cv-80, Dkt. No. 107.  When read in light of the specification, the asserted claims are directed to non-abstract, concrete improvements to existing graphical user interfaces in dating applications.

### G.     The Asserted Patents Do Not Present Any Significant Preemption Concerns.

Muzmatch contends, in passing, the Asserted Patents "monopolize the economic practice of matching people according to mutual attraction . . . ."  Dkt. No. 11 at 1.  To the contrary, the claims recite a specific visual and physical improvement to a user interface.  There remain many other computer-based systems to connect people based on mutual attraction, e.g., scroll-based, grid-based, card-based using buttons, non-dragging-gesture-based, etc.  Tinder invented a specific matchmaking system and interface.  The patent system is designed to reward such innovations.

102237174.1

III.   **CONCLUSION**

In view of the foregoing, the Court should deny Muzmatch's motion.

Respectfully submitted,

Date:  April 22, 2021

_/s/ Robert Greeson_

Robert Greeson (*pro hac vice*)
Texas Bar No. 24045979
robert.greeson@nortonrosefulbright.com
Brett C. Govett
Texas Bar No. 08235900
brett.govett@nortonrosefulbright.com
James Stephen Renard
Texas Bar No. 16768500
james.renard@nortonrosefulbright.com
Jacqueline G. Baker
Texas Bar No. 24109609
jackie.baker@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
Facsimile:  (214) 855-8200

Erik Janitens (*pro hac vice*)
Texas Bar No. 24097878
erik.janitens@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Facsimile:  (713) 651-5246

Stephanie Schmidt
Texas Bar No. 24106406
stephanie.schmidt@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 536-3051
Facsimile:  (512) 536-4598

**NORTON ROSE FULBRIGHT US LLP**
*Attorneys for Plaintiff Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 22, 2021, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system in accordance with the Federal Rules of Civil Procedure.

*/s/ Robert Greeson*
Robert Greeson
